No. 104,236

University of Kansas Hospital Authority, *Appellant*, v. The Board of Commissioners of the County of Wabaunsee, Kansas, *Appellee.*

(327 P.3d 430)

Opinion filed June 27, 2014.

*Jennifer Martin Smith*, of Topeka, argued the cause, and *E. Lou Bjorgaard Probasco*, of Probasco & Associates, P.A., of Topeka, was with her on the briefs for appellant.

*Norbert C. Marek, Jr.*, county attorney, argued the cause and was on the brief for appellee.

*Nathan Eberline*, of Topeka, was on the brief for *amicus curiae* Kansas Association of Counties.

The opinion of the court was delivered by

Luckert, J.: Prior Kansas appellate decisions require a sheriff to provide medical care to a prisoner in the sheriff's custody and a county to pay for the care if the prisoner is indigent and has no other means of payment. Relying on this caselaw, the University of Kansas Hospital Authority (Hospital Authority) sued the Board

of Wabaunsee County Commissioners (County) for reimbursement of the medical expenses incurred in the treatment of a man who jumped through the fourth-story window of an unlocked interrogation room in the Wabaunsee County jail where he had been placed by sheriff officials during an investigation.

We hold the County is not obligated to pay the expenses because the injured man, although temporarily detained, was not a prisoner committed to or held in the county jail at the time he was injured and hospitalized.

### FACTS AND PROCEDURAL BACKGROUND

The relevant facts are uncontroverted. This dispute arose on April 5, 2006, when Ector Manuel Savala-Quintero, a/k/a Alberto Contreras Gonzalez, (Contreras) sustained multiple physical injuries after his jump and four-story fall from the Wabaunsee County jail. To explain the circumstances relevant to a determination of whether he was a prisoner in the sheriff's custody at the time he was hospitalized, we begin approximately 1 month earlier, when a Kansas Highway Patrol trooper in Wabaunsee County had arrested Contreras on drug-related charges. While Contreras was in the Wabaunsee County jail awaiting trial, a federal agent with the United States Immigration and Customs Enforcement (ICE) interviewed him over the telephone and then faxed a form I-247 Immigration Detainer to the Wabaunsee County Sheriff's Office. The detainer was not a warrant but required the sheriff's office to detain Contreras for no longer than 48 hours so that ICE would have "adequate time . . . to assume custody of the alien."

On March 21, 2006, Contreras and the Wabaunsee County Attorney entered into a diversion agreement concerning the Wabaunsee County charges. The diversion agreement led to Contreras' release from the Wabaunsee County jail on March 28, 2006. Contreras was immediately taken to the Shawnee County jail on an outstanding warrant. A copy of the ICE detainer was sent with him. Contreras bonded out of the Shawnee County jail on April 5, 2006, and was to appear in court the following day.

On the evening of April 5, 2006, Contreras returned to the Wabaunsee County courthouse to retrieve some personal items he had

left at the jail, which is located on the fourth floor of the court-house. To enter the courthouse building after 5 p.m., a person must "buzz dispatch" to let him or her in. Contreras arrived with his sister and her boyfriend.

Jailer Barbara O'Connor of the Wabaunsee County Sheriff's Office received a call from dispatch around 7:30 p.m., indicating that Contreras was at the courthouse door and wanted to collect his belongings. Before allowing Contreras to enter, O'Connor called her supervisor, Captain Joe Lamb. O'Connor was concerned that Contreras might have escaped from another facility. Captain Lamb also believed that Contreras should still be in jail because of the " 'Federal Hold' " placed on him. He instructed O'Connor to allow only Contreras in the building and to place Contreras in the " 'fingerprint' room," which is a room used for fingerprinting, no-contact visitation, and interrogation, until Captain Lamb's arrival at the jail.

Contreras was buzzed into the courthouse and, without escort, rode the elevator to the jail. O'Connor met him there and led him through the secure jail door and to the fingerprint room. Upon placing Contreras in the room, O'Connor left, closing the door behind her, and went to look for Contreras' personal belongings.

O'Connor was the only employee in the jail at the time. Given that situation, the fingerprint room was the most secure location to leave Contreras alone because a security camera fed live video from the room to dispatch. Thus, Contreras could be monitored for any action that would create a security risk to O'Connor or the jail. The door to the fingerprint room, although capable of being locked, was not locked. Nevertheless, to open the door, the door knob had to be turned "in the opposite direction than is custom-ary." The room did not have bars or any other barriers on the windows.

When Captain Lamb arrived at the jail, he asked Contreras about the status of his Shawnee County warrant and the ICE de-tainer. Contreras told Captain Lamb he had bonded out on the Shawnee County warrant but simply shrugged his shoulders at the mention of the ICE detainer. Captain Lamb told Contreras to " 'have a seat' " while he checked on Contreras' status. While Con-

treras was in the room alone, he made two unsuccessful attempts to turn the door knob and then knocked on the door.

Captain Lamb went to the dispatch area to check on Contreras' status. Via the live video feed he saw Contreras pick up a chair, smash a window, and then jump out of the window. Contreras landed on the ground below. Captain Lamb instructed O'Connor to have dispatch call for an ambulance and then ran downstairs.

After Contreras hit the ground, he attempted to get up and run away, but he could not move because his hips were broken. A Wabaunsee County Sheriff's deputy and a Kansas Highway Patrol trooper, who had been dining across the street, responded to the emergency call. When Lamb and the other officers arrived, they saw Contreras on the ground. Contreras' sister was straddling his chest, screaming and crying in Spanish, and her boyfriend approached officers with his hands in his pockets. Because Contreras was a " 'known felon' " and the officers did not know the identities of Contreras' companions, they handcuffed Contreras, his sister, and her boyfriend for the sake of officers' safety until the situation could be assessed. The handcuffs were removed from all three individuals when the medical emergency technicians arrived. By that time, the situation had calmed down, and officers had realized nobody was at risk. The parties agreed that Contreras was never under arrest. But the highway patrol trooper acknowledged that when a person is handcuffed, he or she is detained and not free to leave.

Contreras was transported to the University of Kansas Medical Center (Medical Center) by helicopter, and a copy of the ICE detainer was given to the Medical Center Police Department on April 6, 2006. Captain Lamb told the Medical Center Police Department that Contreras had not been arrested by the Wabaunsee County Sheriff's Office. Nevertheless, Captain Lamb told the Medical Center Police Department that " 'the ICE still had a hold on him and that they should give the Feds a call.' " Wabaunsee County officers had not been able to confirm Contreras' ICE status on April 5, 2006, because Contreras jumped before Captain Lamb could locate his file.

The County did not charge Contreras with any crimes associated with his jump from the fourth-story jail window. While Contreras was in the hospital, there were no guards placed outside his room, and he was not handcuffed or restrained in any way. The only " 'police hold' " referred to in Contreras' medical record was from ICE. When he was released from the hospital, Contreras was not arrested or taken into custody by law enforcement officers. Moreover, the County was not notified of Contreras' release from the hospital. In addition, ICE had no interest in Contreras after he was released from the hospital.

*District Court Proceedings*

The Hospital Authority sued the County for reimbursement of medical expenses incurred in the treatment of Contreras, alleging four counts. First, the Hospital Authority asserted a claim based on "the statutory right created" under K.S.A. 2006 Supp. 22-4612; later in the petition, the Hospital Authority also cited K.S.A. 19-1910. Second, the Hospital Authority alleged the Wabaunsee County Sheriff contracted to pay the expenses when the sheriff "authorized the treatment" of Contreras, who was in the County's custody. In a third count, the Hospital Authority stated: "The case law in Kansas is clear that the Defendant-County is responsible for the medical treatment of a person in its custody." Finally, the Hospital Authority asserted liability on the theory of quantum meriut.

Both the Hospital Authority and the County filed motions for summary judgment. The parties agreed on the applicable legal standard—"a sheriff has a duty to furnish medical attention to a prisoner in his custody who is in need thereof, at the county's expense if the prisoner is indigent and no other source of funds is available." *Mt. Carmel Medical Center v. Board of County Commissioners*, 1 Kan. App. 2d 374, 378, 566 P.2d 384 (1977) (*Mt. Carmel*) (holding county responsible for medical expenses of individual serving jail sentence who was injured during escape from jail; custody was reacquired before the individual was taken to hospital). As the parties noted, this standard was approvingly cited and applied in *Wesley Med. Center v. City of Wichita*, 237 Kan. 807, 809-12, 703 P.2d 818 (1985) (*Wesley*) (discussing Kansas statutes

to determine whether city or county was responsible for cost of care of prisoner arrested for violation of state law); *Allen Memorial Hosp. v. Board of Butler County Comm'rs*, 12 Kan. App. 2d 680, 681-85, 753 P.2d 1302 (1988) (*Allen*) (holding county responsible for medical treatment of individual brought to hospital after being held in county jail under Alcoholism and Intoxication Treatment Act, K.S.A. 65-4001 *et seq.*); and *Dodge City Med. Center v. Board of Gray County Comm'rs*, 6 Kan. App. 2d 731, 732-34, 634 P.2d 163 (1981) (*Dodge City*) (holding county responsible for treatment of gunshot wound of individual effectively arrested at scene of burglary in progress).

The district court granted summary judgment in favor of the County. In doing so, the court first discussed various statutory provisions that "would be applicable to determining the meaning of 'custody' . . . in this situation." The court determined K.S.A. 2006 Supp. 22-4612, the statute cited in the Hospital Authority's petition as the basis for its claim, only clarified "the payment rate that counties would have to pay for those in their custody, and does not define the meaning of 'custody.'" Further, the court held that K.S.A. 2006 Supp. 22-4612, which was not effective at the time of Contreras' injury, did not operate retroactively.

Addressing the statutes that were in effect at the time of the incident and "would be applicable to determining the meaning of 'custody,'" the district court identified three provisions: K.S.A. 19-1910 (relating to "[c]ost of keeping prisoner under criminal process"); K.S.A. 19-1919 (relating to "[t]reatment of prisoners"); and K.S.A. 22-2202(9) (defining "custody"). The district court concluded the County's obligation under K.S.A. 19-1910 was limited to situations in which the medical expenses were incurred in the treatment of "'prisoners'" who are "'committed to a county jail'" or "'held within the county.'" Addressing K.S.A. 19-1919, the district court noted that this provision "is more general, in that it provides, in pertinent part, that 'all prisoners shall be treated with humanity.'" Then addressing the two statutes together, the district court stated: "The constant with these statutes is that the reference is to 'prisoners.'"

Finally, the district court determined that to the extent caselaw imposed a requirement that the individual be in custody, the applicable definition is found in K.S.A. 22-2202(9). That provision defines "custody" as "the restraint of a person pursuant to an arrest or the order of a court or magistrate."

The district court subsequently cited and discussed the decisions in *Mt. Carmel, Wesley, Allen,* and *Dodge City.* Applying the facts of those cases, the district court held a county is obligated to pay an indigent individual's medical expenses only if the individual is under arrest, is a prisoner in the county jail, or is confined in the jail as otherwise provided by law, such as through civil commitment proceedings. Because none of those circumstances applied to Contreras' detention, the district court concluded Contreras was not in the Wabaunsee County Sheriff's custody at the time of his jailhouse jump and denied relief on the Hospital Authority's statutory and common-law claims. The district court also denied relief on the Hospital Authority's contract and quantum meriut claims because those claims were based on the alleged duty of the sheriff and the sheriff's implied authority to contract on behalf of the County and no such duty existed under the circumstances of this case.

*Court of Appeals' Proceedings*

The Hospital Authority appealed. In its brief before the Court of Appeals, the Hospital Authority did not cite any of the statutes on which it had based its statutory claim against the County. Nor did it present an argument based on its contract claim. Instead, it relied on caselaw to argue the district court had too narrowly defined the meaning of a prisoner in a sheriff's custody. The Hospital Authority also argued it was entitled to equitable relief based on quantum meriut.

The Court of Appeals agreed with the Hospital Authority that the district court's definition of custody was too limited. *University of Kansas Hosp. Auth. v. Board of Wabaunsee County Comm'rs,* No. 104,236, 2011 WL 2040254, at *5 (Kan. App. 2011) (unpublished opinion) (*Hospital Authority*). In doing so, the panel relied on two of the four cases discussed by the district court—*Dodge City,* 6 Kan. App. 2d 731, and *Mt. Carmel,* 1 Kan. App. 2d 374. In

*Dodge City*, a burglar was wounded while being apprehended at the scene of the crime and was transported from the crime scene directly to the hospital without first going to jail. Likewise, in *Mt. Carmel* the individual was not in jail immediately preceding his transport to the hospital; the individual, who had been serving a jail sentence, was injured when he escaped from jail. Law enforcement officers reacquired custody before he was transported to the hospital. The Court of Appeals held these cases "clearly indicate that it is not the fact of actual confinement or incarceration in a detention facility which controls the issue of liability, but rather the indicia of custody." *Hospital Authority*, 2011 WL 2040254, at *5.

The Court of Appeals adopted this indicia-of-custody standard after noting the word " 'custody' is a very elastic term and is not limited to a person's actual physical confinement in a jail." 2011 WL 2040254, at *3 (citing Black's Law Dictionary 384 [6th ed. 1990]). The Court of Appeals recognized the restrictive meaning of "custody" found in the statute cited by the district court, K.S.A. 22-2202(9) (defining "custody" as "the restraint of a person pursuant to an arrest or the order of a court or magistrate"). But the Court of Appeals noted this court has more broadly determined an individual is in custody if " 'there were some significant restraints on his freedom of movement which were imposed by some law enforcement agency.' " 2011 WL 2040254, at *3 (citing *State v. Louis*, 240 Kan. 175, 181, 727 P.2d 483 [1986] [applying the test used in custodial interrogation cases to the word "custody" for purposes of implied consent statute allowing blood-alcohol testing, K.S.A. 8-1001]).

Concluding this broader restraints-on-freedom test applied to the determination of whether an individual was in a sheriff's custody for purposes of obligating the county to pay for the individual's medical care, the Court of Appeals held: "Once an arrest is made, charges are filed, or other restraints are placed upon the individual's liberty, the sheriff assumes responsibility for all later costs associated with the person's medical care." 2011 WL 2040254, at *5. The Court of Appeals then concluded that significant restraints had been placed on Contreras' freedom. The Court of Appeals

reasoned that the law enforcement officers would not have allowed Contreras to walk away if he had not been injured but would have taken him into custody for criminal damage to property. 2011 WL 2040254, at *4. Then, the Court of Appeals focused on three additional facts: (1) Contreras was told to enter the locked courthouse alone; (2) he was placed in a " 'secure' room"; and (3) he was temporarily handcuffed. These circumstances, according to the Court of Appeals, were "sufficiently similar to actual custody to require Wabaunsee County to bear the cost of his medical care. [Citation omitted.]" 2011 WL 2040254, at *5. This was true "[e]ven though some of the indicia of formal custody were not present." 2011 WL 2040254, at *5.

Although the County had cited and discussed some of the statutes on which the Hospital Authority had initially based its claim as well as additional statutes, some of which were discussed in the four cases cited by the parties and discussed by the district court, the Court of Appeals did not discuss these statutes.

## Petition for Review

The County petitioned for review, arguing the Court of Appeals' holding was so broad it would encompass any sort of detention by a law enforcement officer, including an investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The County urged adoption of the district court's more limited view of a county's obligation. In addition, the County argued the Court of Appeals erred when it weighed evidence and made findings of fact beyond those facts agreed upon by the parties in their dueling summary judgment motions. Specifically, the County objected to the Court of Appeals' findings that (1) the officers would not have allowed Contreras to walk away, and (2) Contreras committed the crime of criminal damage to property. The Hospital Authority responded that the Court of Appeals' reasoning was supported by applicable caselaw.

This court granted the County's petition for review under K.S.A. 20-3018(b) and has jurisdiction under K.S.A. 60-2101(b). After review was granted, the Kansas Association of Counties filed an *amicus curiae* brief in which it argued a county's liability is limited to

situations spelled out in the statutes. The *amicus* also suggests the Court of Appeals went off track by divorcing its discussion of *Dodge City* and *Mt. Carmel* from the relevant statutes that define a county's obligation.

## ANALYSIS

As we consider these arguments, the facts on which the district court based its decision are undisputed. Instead, the controversy involves the legal conclusions of the Court of Appeals and the district court, which interpreted and applied several statutes in its analysis. This court applies an unlimited appellate standard of review when considering judicial conclusions of law and questions of statutory interpretation. *Polson v. Farmers Ins. Co.*, 288 Kan. 165, 168, 200 P.3d 1266 (2009); see *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013) (exercise unlimited review of legal conclusions); *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009) ("When material facts are uncontroverted, as they are in this case, an appellate court reviews summary judgment de novo."); *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 819, 104 P.3d 378 (2005) (statutory interpretation is question of law providing for de novo appellate review).

With this standard of review in mind, it is helpful to clarify what is not before us. As we have noted, in the Hospital Authority's appellate brief to the Court of Appeals it did not address the district court's denial of its contract claim. Nor did it cite the statutes on which it had based its statutory claim—K.S.A. 2006 Supp. 22-4612 and K.S.A. 19-1910. Furthermore, it did not discuss the district court's ruling that K.S.A. 2006 Supp. 22-4612 did not apply because it was not effective until after Contreras was injured. Consequently, the Hospital Authority has waived those contractual and statutory theories of recovery. See *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) (when a litigant fails to adequately brief an issue it is deemed abandoned); Supreme Court Rule 6.02(a)(5) (2013 Kan. Ct. R. Annot. 39) (appellant's brief must include the "arguments and authorities relied on").

While we will not revisit the waived issue of whether K.S.A. 2006 Supp. 22-4612 applies retroactively to this case and will not consider allowing the Hospital Authority's statutory claim because of the waiver, we must consider the statutes on which the district court relied. As we will explain, these statutes—K.S.A. 19-1910, K.S.A. 19-1919, and K.S.A. 22-2202—are an integral part of the rationale underlying the appellate decisions cited by the Hospital Authority.

This reliance is evidenced in the basis for the *Mt. Carmel* court's statement of a sheriff's and a county's duties. Specifically, the *Mt. Carmel* court cited two cases: *Levier v. State,* 209 Kan. 442, 497 P.2d 265 (1972), and *Pfannenstiel v. Doerfler,* 152 Kan. 479, 105 P.2d 886 (1940). In *Levier,* 209 Kan. at 445-48, this court recognized the duty to provide a prisoner with medical care arose from the Constitutions of the United States and Kansas. And in *Pfannenstiel,* 152 Kan. at 483, this court held "[i]t is the duty of a sheriff or other officer having lawful custody of a prisoner to treat the prisoner properly, and, as the statute (G.S. 1935, 19-1919) says, 'with humanity.' " This statute currently includes the same wording and is found at K.S.A. 19-1919.

While K.S.A. 19-1919 provides a basis for finding that a sheriff must provide medical care to prisoners, it does not address which governmental official or entity has the duty to pay for the care. The importance of this distinction is underscored by looking at caselaw relative to both the constitutional and statutory duty to provide medical care to prisoners.

Focusing first on the United States and Kansas Constitutions as potential sources of the County's duty to pay the Hospital Authority for Contreras' care, we observe that an extended discussion of the constitutional caselaw is not necessary because the Hospital Authority has never asserted a constitutional duty. Instead, we mention the line of cases only because, subsequent to the decision in *Levier,* the United States Supreme Court drew a distinction between the duty to provide the care and the duty to pay for the care. Specifically, the Court clarified that, while the Constitution imposes a duty to provide medical care for prisoners in certain situations, "as long as the governmental entity ensures that the medical

care needed is in fact provided, the Constitution does not dictate how the cost of that care should be allocated as between the entity and the provider of the care. That is a matter of state law." *Revere v. Massachusetts General Hospital*, 463 U.S. 239, 245, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983). The Court went on to note: "If, of course, the governmental entity can obtain the medical care needed for a detainee only by paying for it, then it must pay. There are, however, other means by which the entity could meet its obligation." 463 U.S. at 245. One option listed by the Court is for the government to rely on federal or state laws that require hospitals to provide medical care to indigent persons. 463 U.S. at 245.

The same distinction between the duty to provide medical care and the duty to pay for the care has been drawn in Kansas caselaw. At least since 1872, this court has recognized that a sheriff having custody of prisoners has a statutory duty to provide necessary medical care. See *Atchison County v. Tomlinson*, 9 Kan. 167, 175 (1872); accord G.S. 1868, ch. 25, sec. 105; G.S. 1868, ch. 53, sec. 19. The first of these statutory provisions is currently codified at K.S.A. 19-811, which states: "The sheriff shall have the charge and custody of the jail of his county, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, for whose acts he and his sureties shall be liable." The second is the prior codification of the statute cited in *Pfannenstiel,* 152 Kan. at 483— G.S. 1935, 19-1919—which states, in relevant part, that "[a]ll prisoners shall be treated with humanity." K.S.A. 19-1919.

Regarding the duty to pay for the medical care, in 1872 this court impliedly agreed with the county on appeal that when a sheriff seeks reimbursement from a county for expenses related to the costs of caring for prisoners, "[t]here must be some positive provision made by law, or [a sheriff's] claim cannot be allowed." *Atchison County*, 9 Kan. at 168-69, 172-75; see *Comm'rs of Smith Co. v. Comm'rs of Osborne Co.*, 29 Kan. 72, 74-75 (1882) (statutes require sheriff with custody of prisoners confined to jail to "furnish anything in the way of care or treatment, or bedding, or sustenance, to prisoners," but, without statutory authorization, sheriff cannot demand another county pay for expenses of sheriff even though

sheriff is housing prisoners held on charges filed in the other county).

It is not just the sheriff who depends on a positive provision in the law in order to demand payment from a county for medical care to prisoners. The need for statutory authorization was recognized when, in a case much like this one, a physician sued a county seeking reimbursement for his services in providing medical care to prisoners in the county jail. The suit was dismissed for several reasons, including that the physician had contracted with the sheriff, not the county board, and no statute obligated the county board to pay the physician. *Roberts v. County of Pottawatomie*, 10 Kan. *29, *32 (1872); see also *Hendricks v. Comm'rs of Chautauqua Co.*, 35 Kan. 483, 486-87, 11 Pac. 450 (1886) (duty of keeping county jail and supplying prisoners with board and lodging devolves upon the sheriff; county is not liable to one who furnished supplies to prisoner, even though done at sheriff's request).

The *Roberts* court implied that if the sheriff had made the claim, the county commissioners would have been obligated to consider the claim because of a statute that stated: " 'When a prisoner is committed [to a county jail] in a criminal action, the county board shall allow the sheriff his reasonable charges for supplying such prisoner.' Gen. St. c. 53, § 10." *Roberts*, 10 Kan. at *30, *32. Although the term "maintaining" has now replaced the term "supplying," the substance of this statute has not changed over the intervening time and can now be found at K.S.A. 19-1910(a).

K.S.A. 19-1910, the provision regarding a county's payment obligation, was not cited in *Pfannenstiel, Mt. Carmel, Wesley,* or the other cases cited by the Hospital Authority. It could be argued that these cases appropriately found a common-law duty on the part of the county to reimburse those providing medical care to prisoners. See *Lutheran Medical Center v. City of Omaha*, 229 Neb. 802, 806, 429 N.W.2d 347 (1988) (city has common-law liability to pay for medical treatment required by person in police custody). But imposing a duty in the absence of positive statutory authority would be contrary to the early Kansas cases we have discussed.

Nevertheless, without any attempt to reconcile the two lines of cases—statutory duty or common-law duty—this court in *Wesley*

noted the conflict in Kansas cases regarding the duty to pay and merely concluded that the more recent cases trumped the older ones:

"[L]ater Kansas cases have consistently held that a prisoner's rights include entitlement to medical care at the governmental agency's expense, if the prisoner is indigent and no other source of funds is available. *Levier v. State*, 209 Kan. 442, 497 P.2d 265 (1972); *Pfannenstiel v. Doerfler*, 152 Kan. 479, 483, 105 P.2d 886 (1940); *Dodge City Med. Center v. Board of Gray County Comm'rs*, 6 Kan. App. 2d 731, 634 P.2d 163 (1981); *Mt. Carmel Medical Center v. Board of County Commissioners*, 1 Kan. App. 2d 374, 566 P.2d 384 (1977). It should be noted that several earlier Kansas cases held that a county is not bound to pay a physician for medical services rendered by him to prisoners in the county jail unless such services are authorized by the county. *Hendricks v. Comm'rs of Chautauqua Co.*, 35 Kan. 483, 11 Pac. 450 (1886); *County of Smith v. County of Osborne*, 29 Kan. *72 (1882); *Roberts v. County of Pottawatomie*, 10 Kan. *29 (1872). The later cases, however, place a positive duty upon the county to furnish medical attention to a prisoner in custody who is in need of medical attention, if the prisoner is indigent and no other source of funds is available." *Wesley Med. Center v. City of Wichita*, 237 Kan. 807, 809-10, 703 P.2d 818 (1985).

We need not spend more time questioning whether a more substantive analysis would have led to the same result because subsequent to the 1985 decision in *Wesley*, the Kansas Legislature twice amended K.S.A. 19-1910 to specifically address the obligations of the state and counties to pay for the medical care of prisoners. See L. 2005, ch. 150, sec. 4; L. 2002, ch. 117, sec. 2. (Additional legislation was adopted in 2006; but this is the legislation the district court found was not retroactive. See K.S.A. 2006 Supp. 22-4612.) The 2002 and 2005 amendments also postdate the decisions in *Allen Memorial Hosp. v. Board of Butler County Comm'rs*, 12 Kan. App. 2d 680, 753 P.2d 1302 (1988); *Dodge City Med. Center v. Board of Gray County Comm'rs*, 6 Kan. App. 2d 731, 634 P.2d 163 (1981); and *Mt. Carmel Medical Center v. Board of County Commissioners*, 1 Kan. App. 2d 374, 566 P.2d 384 (1977).

Because the determination of whether a medical provider should be the entity that bears the cost of caring for an indigent individual or whether that cost should be borne by the governmental entity with custody of the individual is a matter of public policy, the ques-

tion is left to the legislature to resolve. See *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, 460, 228 P.3d 403 (2010); see also *Landmark Nat'l Bank v. Kesler*, 289 Kan. 528, 544, 216 P.3d 158 (2009) ("It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy."); *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 364, 204 P.3d 1156 (2009) ("[W]e are not free to act on emotion or even our view of wise public policy. We leave the guidance of public policy through statutes to the legislature."); *State v. Prine*, 287 Kan. 713, 737, 200 P.3d 1 (2009) ("Of course, the legislature, rather than this court, is the body charged with study, consideration, and adoption of any statutory change that might make [the statute] more workable . . . .").

These principles, which are based on basic separation of powers concepts, indicate that K.S.A. 19-1910 controls over the caselaw on which the Hospital Authority relies. The Hospital Authority has not argued a contrary view; instead, as we have noted, it chose not to even cite to the statutes on which the district court based its analysis. Especially in light of the lack of an argument to the contrary, we conclude K.S.A. 19-1910 controls our analysis, and the cases relied on by the Hospital Authority can only be applied to the extent they are consistent with the statutory language.

At the time of Contreras' injury and hospitalization, K.S.A. 19-1910 stated, in relevant part:

"(a) When a prisoner is committed to a county jail in a criminal action, the board of county commissioners shall allow the sheriff reasonable charges for maintaining such prisoner.

"(b)(1) If a person is stopped by or is in the custody of a law enforcement officer, as defined in K.S.A. 22-2202, and amendments thereto, who is an employee of the state and such person is injured by the officer while acting within the scope of such officer's authority, costs incurred for medical care and treatment of the person shall be paid by the state if such care and treatment is required due to the injury and a determination has been made that the person has no other resources.

"(2) All other costs incurred by the county for medical care and treatment of prisoners held within the county shall be paid from the county general fund when a determination has been made that the prisoner has no other resources."

When interpreting this and other statutes, we abide by the fundamental rule of statutory interpretation that " ' "the intent of the

legislature governs if that intent can be ascertained." ' " *State v. Holt*, 298 Kan. 469, 474, 313 P.3d 826 (2013) (quoting *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 3, 218 P.3d 400 [2009]). " '[T]he best and only safe rule for ascertaining the intention of the makers of any written law, is to ,abide by the language they have used.' " *Gannon v. State*, 298 Kan. 1107, 1143, 319 P.3d 1196 (2014) (quoting *Wright v. Noell*, 16 Kan. 601, 607, 1876 WL 1081 [1876]).

Applying the plain language of K.S.A. 19-1910(a), we know that a county is only obligated to pay the sheriff's expenses "[w]hen a prisoner is committed to a county jail in a criminal action," and it is a sheriff, not a county, who has the duty to provide the care. See K.S.A. 19-811; K.S.A. 19-1910. As commonly understood, the word "commit" means to "send (a person) to prison or to a mental health facility, esp. by court order." Black's Law Dictionary 329 (10th ed. 2014). Furthermore, the use of the word "prisoner" in both K.S.A. 19-1910(a) and K.S.A. 19-1910(b)(2)—the two provisions dealing with a county's obligations—limits the applicability of the duty to pay. "Prisoner" means "[s]omeone who is being confined in prison" or "[s]omeone who has been apprehended by a law-enforcement officer and is in custody, regardless of whether the person has yet been put in prison; specif., a person who is kept in prison as legal punishment or who is kept there while awaiting trial as a criminal defendant." Black's Law Dictionary 1388 (10th ed. 2014).

Also, the combination of "prisoner" and "committed" in K.S.A. 19-1910(a), when read in light of those words, definitions, and the phrase "prisoners held" in K.S.A. 19-1910(b)(2), inform us that a county is only liable for the payment of medical bills if the patient is a prisoner who is in jail or would be in jail but for his or her injuries. See *Youngberg v. Romeo*, 457 U.S. 307, 317, 324, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border," but "[w]hen a person is institutionalized— and wholly dependent on the State"—he or she has "postcommitment interests cognizable as liberty interests under the Due Process Clause of the Fourteenth Amendment."); *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (Eighth

Amendment to the United States Constitution requires government to provide medical care to those it punishes by incarceration because "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

The restrictive nature of K.S.A. 19-1910(a) and K.S.A. 19-1910(b)(2) is underscored by the broader language of subsection (b)(1). That provision requires the State to pay for medical expenses if several conditions are met, including if a "person is stopped by . . . a law enforcement officer . . . who is an employee of the state and such person is injured by the officer while acting within the scope of such officer's authority." The legislature could have used similarly broad language in K.S.A. 19-1910(a) and K.S.A. 19-1910(b)(2) when addressing situations where a county is obligated to pay for medical care. Had it done so, the Hospital Authority could have claimed that Contreras had been "stopped" by Captain Lamb. Use of this language would have been consistent with the Court of Appeals' holding that the County's obligation to pay arose because the officers had significantly restrained Contreras' freedom. But the legislature did not do so.

Because the legislature obviously knew how to make the coverage of the statute broader and did not do so, it would be inappropriate for this court to expand a county's obligation. Thus, we hold that under K.S.A. 19-1910, the County would only be obligated to pay for Contreras' medical care if he had no resources to pay for his own care and if he was a prisoner committed to or held in the county jail, meaning he had been sentenced to jail; had been arrested and was being detained in jail while awaiting trial; had been apprehended and arrested and was to be detained in jail while awaiting trial but for his injuries; or had been otherwise committed to jail, such as in a civil commitment proceeding. Under the uncontroverted facts, Contreras was not serving a jail sentence, had not been arrested, and was not otherwise committed to jail at the time of his hospitalization.

Given that the Hospital Authority has abandoned its statutory claim, we briefly mention that this holding would not change the result in any of the cases on which the Hospital Authority relies,

even though there is broader language in at least some of those cases. In *Mt. Carmel*, 1 Kan. App. 2d at 379, the patient was serving a jail sentence and, even though he had escaped, "custody had been reestablished as a matter of law prior to the prisoner[] being placed in the ambulance and transported to the hospital." In *Allen*, 12 Kan. App. 2d at 684, the patient was delivered to the hospital after suffering a seizure while being "held" in protective custody at a county jail under provisions of the Alcoholism and Intoxication Treatment Act, K.S.A. 65-4001 *et seq.*, specifically K.S.A. 1987 Supp. 65-4003(8), (23).

Both *Wesley* and *Dodge City*, dealt with an individual who had been wounded while being arrested on charges that led or would have led to the individual being committed to a county jail while awaiting trial. *Wesley*, 237 Kan. 807, Syl. ¶ 2 ("So long as an offender is arrested for violation of a state law *and in due course is charged with a state crime and delivered to the county jail for confinement,* the medical and other incidental expenses incurred as a consequence of and following his arrest, and until his transfer to such facility, are chargeable to the county."); *Dodge City*, 6 Kan. App. 2d at 733 (although deputy did not say the prisoner was under arrest, an arrest was "implied by all the circumstances"); see *Massachusetts General Hospital v. Revere*, 385 Mass. 772, 777-78, 434 N.E.2d 185 (1982) (citing *Dodge City* for proposition that "[c]ertainly at the time the police bullet entered [a suspect's] body he was under arrest"), *rev'd* 463 U.S. 239 (1983).

We further note that our interpretation of K.S.A. 19-1910 is consistent with the principle stated in *Mt. Carmel*, 1 Kan. App. 2d at 378—"a sheriff has a duty to furnish medical attention to a prisoner in his custody who is in need thereof, at the county's expense if the prisoner is indigent and no other source of fund is available"—if the definition of "custody" found in K.S.A. 22-2202(9) is used. As we have noted, K.S.A. 22-2202(9) defines "custody" as "the restraint of a person pursuant to an arrest or the order of a court or magistrate." This was the interpretation applied by the district court but rejected by the Court of Appeals. We conclude the broader restraint-of-freedom test for custody used by the Court

of Appeals ignores the word "prisoner," as the word "prisoner" is used in K.S.A. 19-1910, and its implications.

We, therefore, affirm the district court's grant of summary judgment in favor of the County on the Hospital Authority's common-law and statutory claims.

*Quantum Meruit*

The Court of Appeals did not address the Hospital Authority's quantum meruit claim because it held the Hospital Authority was entitled to relief based on Kansas caselaw regarding a county's duty to pay. Because we have determined the Hospital Authority's claim on that basis fails, we next consider the Hospital Authority's claim based on quantum meruit.

As this court has explained: "Unjust enrichment/quantum meruit is an equitable doctrine. . . . The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to that person." *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, Syl. ¶ 5, 910 P.2d 839 (1996). To establish an unjust enrichment claim, a plaintiff must establish (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust. *Nelson v. Nelson*, 288 Kan. 570, 580, 205 P.3d 715 (2009); *Haz-Mat Response, Inc.*, 259 Kan. 166, Syl. ¶ 6.

These elements are not satisfied in this case given the uncontroverted facts. The Hospital Authority's theory was that it had performed a valuable service for the County, which was obligated to provide medical care to Contreras as a prisoner in the sheriff's custody. As we have discussed, the County did not have that obligation. Consequently, although the Hospital Authority provided a benefit to Contreras, it did not provide a benefit to the County. See *Via Christi Regional Med. Center, Inc. v. Reed*, 298 Kan. 503, 516-17, 314 P.3d 852 (2013) (citing cases from other jurisdictions that hold patient is unjustly enriched by receiving hospital care at taxpayer's expense and then recovering damages from tortfeasor).

The district court correctly granted the County summary judgment on the quantum meruit claim.

The judgment of the Court of Appeals reversing the district court is reversed. The judgment of the district court is affirmed.