NOT DESIGNATED FOR PUBLICATION

No. 118,428

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STORMONT-VAIL HEALTHCARE, INC.,
*Appellant*,

v.

THE BOARD OF COUNTY COMMISSIONERS FOR JACKSON COUNTY, KANSAS,
*Appellee*,

v.

DUSTIN CHISM,
*Third-party Defendant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; GARY L. NAFZIGER, judge. Opinion filed March 22, 2019. Affirmed.

*E. Lou Bjorgaard Probasco*, of Probasco & Associates, PA, of Topeka, and *Jennifer Martin Smith*, of Topeka, for appellant.

*David R. Cooper* and *Seth A. Lowry*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, for appellee.

Before MALONE, P.J., HILL, J., and WALKER, S.J.

PER CURIAM: Stormont-Vail Healthcare, Inc. appeals the district court's granting of summary judgment in favor of Jackson County. The district court found that Dustin Chism was not in the custody of the Jackson County Sheriff's Office when the decision to seek medical treatment for him was made and therefore Jackson County is not liable for

1

Chism's medical bills under K.S.A. 2017 Supp. 22-4612. Finding no error, we affirm the district court's ruling.

FACTS

The facts in this case are undisputed. Sometime on either June 21, 2011, or June 22, 2011, Daniel Baker, Justin Rupnicki, and Chism broke into and burglarized an out building on property located in rural Jackson County, Kansas. The trio later returned on the evening of June 23, 2011, and attempted to break into and burglarize a residence located on the same property. Chism, who was dressed in dark clothing and wearing a mask and gloves, entered the house and proceeded to the second floor where he was confronted by the property owner, Daymon Devader. Devader drew his weapon and ordered Chism to "'[f]reeze'" and to sit on the ground while he called the police. Rather than comply, Chism made a break for it, at which point Devader fired all of the rounds in his gun at the fleeing Chism. Chism was hit multiple times but managed to break out of the house through a window.

Jackson County Sheriff Tim Morse soon arrived and found Devader standing in front of the residence holding a rifle and waving a flashlight in the air. Devader advised Sheriff Morse that one of the intruders, Rupnicki, was somewhere nearby. As the two men walked toward the house, they spotted Rupnicki hiding behind a tree and he was subsequently arrested. About the same time, Sheriff Morse was informed that Chism's father was on the phone claiming that he had received a call from his son. Chism reportedly told his father that he had been shot and was about 40 yards away from the house. Sheriff Morse then heard a shout and found Chism in a creek bed across the street. Morse ordered Chism to raise his hands. Chism responded by stating that he had been shot. Chism was standing at the time but Sheriff Morse noted that he was "completely white" and obviously hurt.

2

Sheriff Morse joined Chism in the creek bed and called for an ambulance after Chism passed out. After the ambulance arrived, Sheriff Morse and another deputy helped the EMTs use a spine board to carry Chism from the creek bed to the waiting ambulance. At the request of the EMTs, Sheriff Morse directed Deputy Brian Roush to ride with Chism in the ambulance. The ambulance transported Chism to Mayetta where he was transferred to a Life Star helicopter and flown, unaccompanied by law enforcement, to Stormont-Vail in Topeka. The Jackson County Sheriff's Office contacted the Topeka Police Department and asked that an officer be sent to the hospital to wait with Chism. Meanwhile, a Jackson County patrol sergeant was dispatched to Stormont-Vail to see if Chism was going to survive and record any utterances that Chism might make. The sergeant was not instructed to question Chism or collect any evidence. However, after concluding that Chism would be unable to make any utterances, the sergeant collected Chism's clothes as evidence and returned to Jackson County.

Chism received medical treatment at Stormont-Vail from June 24, 2011, to July 1, 2011. On June 27, 2011, Chism was charged in Jackson County with aggravated burglary, conspiracy to commit aggravated burglary, nonresidential burglary, conspiracy to commit burglary, felony theft, and conspiracy to commit felony theft. A warrant for Chism's arrest was issued later that same day and received by the Jackson County Sheriff's Office on June 29, 2011. On July 1, 2011, Chism checked himself out of Stormont-Vail, against medical advice, and fled to Arkansas where his mother lived. After learning of Chism's departure, Sheriff Morse contacted the Arkansas authorities and explained that Chism had a warrant out for his arrest and it was believed that he was in Arkansas with his mother. The Arkansas authorities located Chism, and he was transported back to Kansas. The arrest warrant was subsequently executed on July 8, 2011. Chism was eventually convicted and sentenced to prison for his role in the burglaries.

On June 26, 2014, Stormont-Vail filed a petition in Jackson County District Court, alleging that Chism was in the custody of the Jackson County Sheriff's Office when it was determined he needed medical attention. Therefore, Stormont-Vail claimed Jackson County was liable for the medical bills that Chism incurred from June 24, 2011, to July 1, 2011. At the Medicaid rate, that amounted to $39,579.39. Jackson County denied the allegations.

At this point, the procedural path of the case was marked by a tragic event. On April 8, 2015, Stormont-Vail filed a motion for leave to amend its petition in which it alleged that it forgot to include claims for Chism's later hospital stays. Those stays stemmed from his gunshot wounds but occurred after he was arrested and taken into custody on July 8, 2011. Jackson County opposed the amendment and a hearing was held on July 7, 2015. At the close of that hearing, the district court asked each party to provide it with the relevant cases and took the matter under advisement. Unfortunately, not long after that hearing, the district court judge assigned to the case, Judge Micheal Ireland, passed away. A new judge was eventually appointed to the case and on May 17, 2017, a new hearing on Stormont-Vail's motion to amend was held. At the close of that hearing, the district court denied the motion, finding that the proposed amended claims stemmed from two separate factual incidents and therefore "it would be inappropriate to combine them for trial."

Following the denial of its motion to amend, Stormont-Vail attempted to file an interlocutory appeal with our court pursuant to K.S.A. 2017 Supp. 60-2102(c). However, it was unclear from the record whether the district court had certified the issue for an interlocutory appeal. We therefore remanded the case to the district court with instructions to clarify whether it intended to certify the action for immediate appeal. The district court took up that issue at the same time that it addressed the parties' summary judgment motions outlined below. The district court ruled in favor of Jackson County, dismissed Stormont-Vail's action for failing to state a claim, and, in light of that ruling,

4

declared the issue of amendability moot. Stormont-Vail now appeals but has failed to brief the amendability issue. Thus, Stormont-Vail has abandoned that issue and this decision will only address the district court's ruling granting summary judgment to Jackson County. See *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015).

Stormont-Vail has now timely appealed from the district court's ruling granting Jackson County's motion for summary judgment and finding that Stormont-Vail failed to state a claim upon which relief can be granted.

ANALYSIS

Stormont-Vail's sole issue on appeal is its argument that the district court erred when it granted summary judgment to Jackson County and found that it was not liable for the medical bills that Chism incurred from June 24, 2011, to July 1, 2011. Specifically, Stormont-Vail argues that Chism was in the custody of the Jackson County Sheriff's Office at the time the decision to obtain medical treatment was made and, therefore, pursuant to K.S.A. 2017 Supp. 22-4612(a), Jackson County is responsible for the medical bills that resulted from that treatment.

The summary judgment standard is well-established in Kansas.

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment

5

must be denied.' [Citation omitted.]" *Patterson v. Cowley County Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

Where, as here, there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). Further, when an appeal involves questions of statutory interpretation, it is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015); see also *University of Kansas Hosp. Auth. v. Board of Wabaunsee County Comm'rs*, 299 Kan. 942, 951, 327 P.3d 430 (2014) ("This court applies an unlimited appellate standard of review when considering judicial conclusions of law and questions of statutory interpretation.").

K.S.A. 2017 Supp. 22-4612(a) provides, in part:

"(a) Except as otherwise provided in this section, a county, a city, a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol shall be liable to pay a health care provider for health care services rendered to persons in the custody of such agencies the lesser of the actual amount billed by such health care provider or the medicaid rate."

In interpreting this statute, the Kansas Supreme Court has held that

"under K.S.A. 22-4612(a) the obligation of one of the statutorily specified governmental entities . . . to pay for the medical expenses of an indigent criminal offender is triggered by the entity having custody of the indigent offender at the time the decision is made to obtain medical treatment for the offender." *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1006, 348 P.3d 602 (2015).

That holding "is rooted in the government's duty to treat prisoners with humanity." 301 Kan. at 1005; see also K.S.A. 19-1919 ("All prisoners shall be treated with humanity, and in a manner which promotes their reform."); *Wesley Med. Center v. City of Wichita*, 237

Kan. 807, 809, 703 P.2d 818 (1985) ("Kansas cases have consistently held that a prisoner's rights include entitlement to medical care at the governmental agency's expense, if the prisoner is indigent and no other source of funds is available."). But our caselaw does little to clear up the "long-existing ambiguity in this area of law regarding when a person is in 'custody' for liability purposes." *Board of Comm'rs of Unified Gov't*, 301 Kan. at 999.

K.S.A. 2017 Supp. 22-4612 does not define the term "custody." But elsewhere in Chapter 22 it is defined as "the restraint of a person pursuant to an arrest or the order of a court or magistrate." K.S.A. 2017 Supp. 22-2202(i). Similarly, "arrest" is defined as "the taking of a person into custody in order that the person may be forthcoming to answer for the commission of a crime." K.S.A. 2017 Supp. 22-2202(d). Therefore, at the very least and "under the plain meaning of the statutes, a person is in custody when under arrest." *Board of Comm'rs of Unified Gov't*, 301 Kan. at 1003. In *Board of Comm'rs of Unified Gov't*, it was undisputed that the indigent criminal offender was under arrest at the time the decision was made to obtain medical treatment. As such, although it noted "that arrest might not always be necessary," our Supreme Court declined to "discuss the outer parameters of what might constitute custody." 301 Kan. at 1006.

In this case, Chism was in the midst of burglarizing a home when he was confronted by the homeowner. When Chism tried to run away, the homeowner shot him multiple times. But despite suffering significant injuries, Chism managed to escape and fled to a creek bed across the street. He was eventually found by Sheriff Morse who ordered Chism to raise his hands. But after seeing the extent of Chism's injuries, Sheriff Morse made the decision to seek medical treatment and immediately called for an ambulance.

For a number of reasons, these undisputed facts push the outer parameters of what might constitute custody past the breaking point. First, at no point prior to the decision to

7

seek medical treatment was Chism placed under arrest at the crime scene. Although an arrest warrant was issued on June 27, 2011, it was not executed until July 8, 2011. During that time interval, Chism was able to check himself out of Stormont-Vail, albeit against medical advice, and flee to Arkansas.

At the time of their encounter Sheriff Morse had, at most, only probable cause to believe that Chism had committed a felony. He neither witnessed Chism commit a felony nor did he cause Chism's injuries. As such, Sheriff Morse was never under any sort of statutory duty or obligation to either arrest Chism or take him into custody. At the time his arrest authority was discretionary, not mandatory. See K.S.A. 22-2401(c)(1) (A law enforcement officer *may* arrest a person if the officer has probable cause to believe the person has committed a felony.). In fact, Sheriff Morse chose to do neither of those things and instead chose to seek medical treatment for Chism, who was clearly in desperate need of medical assistance. As a result, we conclude that Chism was not formally in the custody of the Jackson County Sheriff's Office at the time that the decision to seek medical treatment was made.

Despite this, Stormont-Vail makes a number of arguments in support of its claim that Chism was in custody at the time the decision to seek medical treatment was made. We will review those contentions, but we find each contention to be ultimately unpersuasive.

First, Stormont-Vail argues that a formal arrest is not required to establish custody. And it is true that Kansas caselaw is replete with examples of indigent persons who were not formally arrested but still found to be in custody. See *Allen Memorial Hosp. v. Board of Butler County Comm'rs*, 12 Kan. App. 2d 680, 685, 753 P.2d 1302 (1988) ("Once a county law enforcement officer places an indigent, intoxicated person in protective custody and transports that person to the county jail because an alcohol treatment facility is not available, the intoxicated person is 'in custody' and the county is liable for any

8

medical expenses that person may incur while 'in custody.'"); *Dodge City Med. Center v. Board of Gray County Comm'rs*, 6 Kan. App. 2d 731, 732-33, 634 P.2d 163 (1981) (county responsible for treatment of gunshot wound of individual apprehended by sheriff at scene of burglary in progress; the individual was in custody because "[h]ad he not been injured there is no question but that pursuant to duty the sheriff would have taken him to jail and not the hospital"); *Mt. Carmel Medical Center v. Board of County Commissioners*, 1 Kan. App. 2d 374, 379-80, 566 P.2d 384 (1977) (sheriff's deputy had statutory duty to reacquire custody of escaped prisoner and therefore "custody had been reestablished as a matter of law prior to the prisoner's being placed in the ambulance and transported to the hospital").

In each of those cases, however, the governmental entity had a statutory duty to arrest or otherwise take protective custody of the individuals in question. By contrast, no such duty existed in this case. Instead, Sheriff Morse had discretion regarding whether to arrest Chism. See K.S.A. 22-2401(c)(1) (A law enforcement officer *may* arrest a person if the officer has probable cause to believe the person has committed a felony.). He chose not to and therefore Chism was not in the custody of the Jackson County Sheriff's Office when the decision was made to seek medical treatment. See *Board of Comm'rs of Unified Gov't*, 301 Kan. at 1006.

Stormont-Vail next argues that had Chism not been injured and in need of medical treatment, he would have been arrested and taken to jail rather than to a hospital. In support of this, Stormont-Vail notes that both of Chism's uninjured coconspirators, Rupnicki and Baker, were immediately arrested and taken to jail on the night of the incident. In fact, Sheriff Morse even testified that he specifically chose not to arrest Chism because of his significant injuries. But absent a statutory duty to either arrest Chism or take him into protective custody, Stormont-Vail's "implied arrest" argument finds little support in the caselaw. See *Dodge City Med. Center*, 6 Kan. App. 2d at 732 ("[The indigent criminal offender] was apprehended in the commission of a felony. Had

9

he not been injured there is no question but that *pursuant to duty* the sheriff would have taken him to jail and not to the hospital." [Emphasis added.]); *Mt. Carmel Medical Center*, 1 Kan. App. 2d at 379 ("The deputy, as an agent of the sheriff, clearly *had a statutory duty and obligation* to reacquire custody of [the indigent criminal offender.]" [Emphasis added.]). Instead, as we observe above, Sheriff Morse had complete discretion to either arrest or not arrest Chism based on the circumstances. See K.S.A. 22-2401(c)(1) (A law enforcement officer *may* arrest a person if the officer has probable cause to believe the person has committed a felony.). It is thus irrelevant that Rupnicki and Baker were arrested on the night of the incident. Similarly, it is also irrelevant that Chism would have likely been arrested had he not been injured. Because of our conclusions, we reject Stormont-Vail's "implied arrest" argument as unpersuasive.

In a supplement to its brief, Stormont-Vail also points us to the recent decision by a panel of this court in *Stormont-Vail Healthcare v. Board of Jackson County Comm'rs*, No. 117,650, 2018 WL 2170117 (Kan. App.) (unpublished opinion), *rev. denied* 309 Kan. __ (December 18, 2018), as another example of where a formal arrest is not necessary for a person to be considered in custody so as to trigger county responsibility for medical bills.

In *Stormont-Vail Healthcare*, Corey Mellenbruch had been stopped by a Jackson County deputy for running a stop sign. Before the officer could approach his vehicle, Mellenbruch sped off, leading to a lengthy high speed police chase eventually resulting in Mellenbruch rolling his vehicle. When Mellenbruch attempted to flee the accident scene on foot, he was so hobbled by an ankle injury that he was quickly overtaken by the same pursuing deputy and surrendered. Because arriving medical personnel felt Mellenbruch needed medical attention, he was taken by ambulance to Stormont-Vail. Although the Jackson County Sheriff's Department arranged for the hospital to take a blood test to see if Mellenbruch was driving while intoxicated, he was not placed under formal arrest by the deputy nor was he arrested on his release from the hospital. Similarly to our case,

10

Stormont-Vail ultimately filed suit against Jackson County for Mellenbruch's unpaid medical bills, and the district court found that since the defendant was never arrested, Jackson County was not responsible to pay those bills.

In reversing the district court on appeal, the panel in *Stormont-Vail Healthcare* held that under the law the deputy was *required* to take the defendant into custody and therefore could not decline to perform this duty. 2018 WL 2170117, at *3. Since the deputy personally observed Mellenbruch commit at least three felonies, and one of them (fleeing from or attempting to elude a law enforcement officer under K.S.A. 2017 Supp. 8-1568) required that the defendant be taken into immediate custody, Mellenbruch was effectively in custody when the deputy directed he be taken to Stormont-Vail. See K.S.A. 8-2104(a)(2). Thus, Jackson County was determined to be responsible for Mellenbruch's medical bills. 2018 WL 2170117, at *3.

While there are certainly parallels between the facts in *Stormont-Vail Healthcare* and our case, including the identity of the parties, we believe they are readily distinguishable factual scenarios. In *Stormont-Vail Healthcare*, the crimes were all committed either in the immediate presence of the deputy, or they were observed by him. One of those felonies carried a statutory mandate that an arrest be made. In our case, Sheriff Morse did not personally observe the burglaries to the Devader residence or the injuries inflicted by Devader on Chism. He was in the initial stages of assessing the situation when Chism's dire medical circumstances came to his attention. None of the potential crimes the Sheriff was investigating carried a statutory mandate that he arrest a suspect on the spot as required by K.S.A. 8-2104(a)(2) for the crime of fleeing from or attempting to elude a law enforcement officer. These distinctions between the cases buttress our conclusion that Sheriff Morse was authorized to exercise his discretion not to arrest Chism. And since we conclude that decision is permitted by our law, and thus Chism was not under arrest or in custody, it follows that Jackson County was not responsible for his medical expenses.

11

Finally, Stormont-Vail argues that Chism was in custody because the facts of this case are more akin to a custodial interrogation than they are to an investigatory stop.

Kansas courts have long recognized a distinction between the two concepts, finding that "[a] 'custodial interrogation' is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *State v. Jacques*, 270 Kan. 173, 185-86, 14 P.3d 409 (2000). By contrast, an investigatory stop "is the questioning of a person by a law enforcement officer in a routine manner in an investigation that has not reached the accusatory stage and where such person is not in legal custody or deprived of his or her freedom in any significant way." 270 Kan. at 186. However, merely being considered a possible suspect is not enough, standing alone, to elevate an investigatory stop to a custodial interrogation. *State v. Warrior*, 294 Kan. 484, 503, 277 P.3d 1111 (2012).

Stormont-Vail claims that Sheriff Morse's investigation had reached the accusatory stage because he had more than a reasonable suspicion and in fact "knew full well [that] a crime had occurred, that it had occurred the day before as well, and that someone had been shot." But this argument misstates the facts of this case. Sheriff Morse had arrived at the scene mere minutes before his encounter with Chism. And while he may have had probable cause to believe that a crime had occurred and to suspect that Chism was involved, he was still in the process of gathering facts and investigating Devader's claims when he made the decision to obtain medical treatment for Chism. And even if Sheriff Morse considered Chism a possible suspect, that alone is not enough to establish that Chism was in custody. See *Warrior*, 294 Kan. at 503.

In summary, we find that Chism was not in the custody of the Jackson County Sheriff's Office when the decision to seek medical treatment was made and that, as a result, Jackson County is not liable for the medical bills that Chism incurred.

12

Affirmed.