NOT DESIGNATED FOR PUBLICATION

No. 118,323

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITIMORTGAGE, INC.,
*Plaintiff*,

v.

DOROTHY M. WHITE, *et al.*, (DAVID C. KIRK),
*Third-party Plaintiff/Appellant*,

v.

CITIMORTGAGE, INC. RESEARCH SERVICES and
BNC NATIONAL BANK, a.k.a. BNC MORTGAGE DIVISION,
*Third-party Defendants*,

and

KANSAS SECURED TITLE & ABSTRACT CO., INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed March 15, 2019. Reversed and remanded with directions.

*Donna L. Huffman*, of The Law Office of Donna L. Huffman, of Oskaloosa, for appellant.

*Gregory A. Lee*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, for appellee.

Before STANDRIDGE, P.J., PIERRON and GREEN, JJ.

PER CURIAM:  As a third-party plaintiff, Dorothy M. White sued Kansas Secured Title & Abstract Co., Inc. (KST) under K.S.A. 2010 Supp. 50-626(b)(1)(a), (b)(2), (b)(3), and (b)(7), K.S.A. 50-627, and K.S.A. 2010 Supp. 50-677 of the Kansas Consumer Protection Act (KCPA). She argued that KST overcharged her for two UPS courier fees and for a mortgage registration fee in closing a mortgage loan transaction between White and BNC National Bank (BNC). After a bench trial, the trial court ruled against White. First, the trial court found that KST properly charged White for the two UPS courier fees. Then, the trial court found that White failed to sustain her burden of proof on her mortgage registration fee claims.

White appeals, challenging each of the trial court's rulings that KST did not violate the KCPA. White also argues that the trial court erred by not allowing her to amend her pleading and by not granting her request for a jury trial. Yet, only White's argument that the trial court erred by ruling that KST did not violate K.S.A. 2017 Supp. 50-626(b)(1)(a) of the KCPA has merit. For this reason, we reverse and remand to the trial court for a hearing on what penalties White is entitled to under the KCPA.

On August 11, 2010, CitiMortgage, Inc. moved to foreclose the mortgage on White's house for nonpayment. White had entered into the mortgage in October 2008 to secure repayment of a $43,750 loan from BNC.

When White answered CitiMortgage, she also raised 10 counterclaims against CitiMortgage, BNC, and KST. Her final counterclaim against the parties involved the KCPA. All claims against CitiMortgage and BNC were dismissed. Moreover, the trial court granted KST's motion for summary judgment. This included White's allegation that KST "presented a settlement statement knowing the courier fees and recording fees were incorrect while misrepresenting [that the courier fees and recording fees] were the correct charges[,] which concealed the overcharge."

2

White appealed the trial court's decision to grant summary judgment in favor of KST to this court. This court affirmed the trial court's decision except for White's counterclaim involving violations of the KCPA. *CitiMortgage, Inc. v. White*, No. 107,895, 2013 WL 5422317 (Kan. App. 2013) (unpublished opinion) (*CitiMortgage I*). This court concluded that the trial court erred on the KCPA claim because it granted KST's summary judgment motion based solely on White not meeting the KCPA statute of limitations when her claim was timely. 2013 WL 5422317, at *11.

On remand to the trial court, KST again moved for summary judgment, arguing that White failed to plead a factual basis that constituted a violation under the KCPA. The trial court granted KST's motion. White appealed. This court reversed the trial court in *CitiMortgage, Inc. v. White*, No. 112,098, 2016 WL 199059, at *3 (Kan. App. 2016) (unpublished opinion) (*CitiMortgage II*):

> "The mental state required to prove a violation of K.S.A. 50-626(b)(1) [of the KCPA] ('knowingly or with reason to know') is a more forgiving standard for consumers than the willfulness requirement under K.S.A. 50-626(b)(2) or (b)(3). *Via Christi Regional Med. Center, Inc. v. Reed*, 298 Kan. 503, 521, 314 P.3d 852 (2013). Under subsections (b)(2) and (b)(3), a consumer must show some designed purpose to do wrong in order to show willful conduct. In other words, a consumer must show intentional conduct on the part of the wrongdoer. 298 Kan. at 522.

> "In *Via Christi*, the Kansas Supreme Court specifically stated: 'Certainly, an overcharge or duplicate charge—in essence, a demand for payment for a service the consumer did not receive—misrepresents the use, benefit, or quantity of that service.' 298 Kan. at 521. Thus, an overcharge could be analyzed under K.S.A. 50-626(b)(1)(A) which, as discussed above, only requires a consumer to allege that the defendant acted knowingly or with reason to know. White also uses the language of K.S.A. 50-626(b)(2) and (b)(3), by alleging that KST acted willfully when it presented an inaccurate settlement statement. White plainly alleged in her counterclaim that KST knowingly or willfully overcharged her for courier fees and recording fees."

3

On remand to the trial court, White sought to show that KST violated K.S.A. 50-626(b)(1)(a), (b)(2), (b)(3), and (b)(7) of the KCPA in two ways. First, White argued that KST knowingly prepared a settlement statement, charging her with $40 in UPS courier fees when KST actually paid UPS $16.92 for each courier fee. Second, White argued that KST knowingly charged her $64 for the mortgage recording fee when the actual mortgage recording fee was only $60. KST responded that it rightfully charged White a $20 flat fee for her two UPS courier fees. Further, KST admitted that it overcharged White $4 for her mortgage recording fee. Yet, KST argued that it did so by mistake, not deception.

The court held a trial on White's allegations. At trial, White called several witnesses on her behalf.

Rebecca Nioce, the Shawnee County Register of Deeds since 2013, testified that on October 8, 2008, KST registered four deeds with the County in the afternoon. She explained that a law firm paid for three of the registrations, while White paid for the fourth registration. Nioce testified that only one of four registration fees was for the correct amount. The law firm overpaid $4 on one registration fee, the law firm overpaid $2 on another registration fee, and White overpaid $4 on her registration. She further testified that there was a $9 underpayment for an assignment of title associated with KST that same day.

Karen Collins, who had been the Shawnee County Register of Deeds the 39 years before Nioce, testified that sometimes when registering deeds from title companies there would be small overcharges or shortages. Collins explained that instead of contacting the title company when there were overages, the County placed the money in a cash kitty. Then, when there was shortage, the County would take money from the cash kitty to

4

cover the shortage. Collins did not know if KST more frequently overpaid or underpaid when registering titles. But, she testified that KST was "usually right on the money."

An attorney from the law firm testified that the law firm's books did not show a $4 refund for the first registration fee. The attorney explained she did not have records of the second transaction, but she could also not recall a $2 refund.

Ranae Baum, the KST closing manager who worked on White's case, testified about the process of closing. She explained that before the actual closing, the lender sent an initial settlement statement—the HUD-1—with estimated costs. Then, as the closing manager, she would work from the initial settlement statement and prepare more accurate information. Baum explained that if she saw something erroneous with a lender's initial settlement statement, she would adjust the charges on a handwritten document. Next, Baum would give her handwritten work to closing officer, Leslie Jo Davis, who would finalize a second settlement statement. Davis would then send the adjustments in the second settlement statement to the lender.

According to Baum, KST would then wait for the lender to approve the adjusted settlement statement, or make further adjustments, before sending the final settlement agreement so the borrower could close. When the lender sent the final settlement agreement, the lender would also send the mortgage to KST for the first time.

Baum explained in all cases one charge on the settlement statement is the mortgage recording fee. KST calculated the fee by the number of pages in the mortgage, charging $8 for the first page and $4 for every page after that. Thus, Baum explained to know the proper mortgage recording fee, KST needed to know the number of pages in the mortgage. She explained that in White's case, BNC had listed the mortgage registration fee at $120 on its initial settlement statement She testified that she reduced the fee to $64 based on a belief that the mortgage would be 15 pages long. She testified that most

5

mortgages were 14 to 16 pages long. Baum admitted that when she was making adjustments, she did not have access to the mortgage. She explained that they "were probably anticipating an Exhibit A" or Legal description" to be attached to the mortgage, which was "common" for BNC. Baum testified (1) that "we probably had communication with [BNC]" and (2) that she "probably [did] not" call BNC to verify the number of pages in the mortgages.

Baum testified that if the mortgage registration fee KST provided was inaccurate, BNC "would have asked us to correct that." Yet, she also testified that KST would have "been relying on [BNC] to change [KST's] closing statements that [KST] submitted for approval if something was wrong." Baum admitted that because White's mortgage contained only 14 pages, KST should have charged White only $60. She also testified that Davis "should have known the accurate charge was $60."

Regarding the courier fee, Baum testified that in BNC's initial settlement statement, BNC charged White $75 in courier fees. She reduced this to two $20 courier fees for two shipments, totaling $40. She explained that $20 was their "file rate with the insurance commissioner" in 2008. KST had to file a "U&U"—a unique and unusual—if it was going to charge a person a different rate for a courier fee.

Davis testified that when a mortgage recording fee was inaccurate, KST could change the settlement statement before closing. She testified that when she closed with White, she believed $64 was an accurate mortgage recording fee "[b]ecause BNC approved [her] final numbers." For this same reason, she testified that she never recounted the pages of the mortgage. Yet, she also testified that she would expect the closing agent, not a lender, to provide accurate information about title fees. She testified that she did not attempt to mislead or deceive White.

6

John H. Stauffer Jr., the vice-president of KST, testified that once White filed the counterclaims against KST, KST became aware of the $4 "mistake." Stauffer testified that he told his staff not to refund White $4 for the mortgage registration fee until the lawsuit was resolved. But, he testified that once the lawsuit was over, KST would refund White the $4.

Stauffer testified that KST does not expect the checks to the County to be off. When asked about why KST does not obtain refunds from the County when there is an overpayment, Stauffer replied:

> "Because nobody at the Register of Deeds tells them if there's a small amount of money coming in and coming out. And you ended up as, as you got your testimony today, it was a $1 item at the end of the items, you don't know where that $1 goes or doesn't go. But if we find out it goes into that disbursement journal and it's my understanding those are then calculated and the refunds are cut. And we eat the undercharges."

Stauffer confirmed that KST paid UPS only $16.92 for each of White's delivery fees. Stauffer further confirmed that absent a U&U filing, it charged all customers a $20 flat fee per UPS delivery fee. He testified that the $20 rate was on file with the Kansas Insurance Department. Stauffer admitted that KST does not tell its clients what it actually pays UPS.

A.W. Pickel III, who owned a lending organization and also had a failed business venture with Stauffer, testified that as a lender, he relied on the title company for accurate fees. He described an experience where the State Banking Commissioner fined his company $11,000 for overcharges for various fees. He testified that it was not his company overcharging, but the title companies overcharging. He stated that his company was fined another "about 11,000" the next year, too. He explained that when title companies overcharge, they do so in small dollar amounts. When asked if he wrote KST

7

about overcharging on fees, he testified: "I'm sure we did and the—only in the sense that we wrote them to about almost every title company we used . . . ."

KST's case consisted of recalling Baum, as well as recalling a KST closer from Jefferson County to clarify previous testimony.

In the end, the trial court ruled that KST did not violate K.S.A. 50-623(b)(1)(a), (b)(2), (b)(3), or (b)(7). Concerning the UPS courier fees, the trial court ruled that "the overnight delivery charges were justified at the option of KST to charge the flat fee which it had registered with the Kansas Insurance Department."

Concerning the $4 mortgage registration fee overcharge, the trial court found that K.S.A. 50-623(b)(1)(a), (b)(3), and (b)(7) did not apply under the facts of White's case. It then ruled that there was no KCPA violation under K.S.A. 50-623(b)(2) for the following reasons: (1) because no evidence showed KST acted "willfully" and (2) because the $4 overcharge was not "material." The trial court concluded that "White ha[d] failed to carry her burden to prove a violation of the KCPA in this case."

*Did the Trial Court Err by Denying White's Motion to Amend Her Pleading?*

At a hearing on December 16, 2016, White orally moved to amend her pleading. Over KST's objection, the trial court granted White's request. It then asked White's attorney how long she needed to amend the pleading. White's attorney stated that given the holiday and medical issues, she would need 30 days. The trial court considered those statements and gave White 28 days to amend her pleading, ordering that White file the amended pleading no later than January 13, 2017. White's attorney thanked the court. The trial court noted that it would not be "very amenable" to future delays given that the case had been pending for over six years.

8

On January 13, 2017, at 6:48 p.m., White moved for more time to file her amended pleading. In the motion, White's attorney asserted (1) that she had other deadlines, (2) that she had served interrogatories in White's case during December 2016, and (3) that she had exceeded "the limits of [her] restrictions" "for [the] week and [that] day." KST objected. The trial court denied White's motion for an extension of time. The trial court found that the issue of White's attorney having other deadlines and filing interrogatories was irrelevant. It further found that White's attorney's medical issues were already taken into account when creating the January 13, 2017 filing deadline. Last, the trial court emphasized that when it granted White's motion to amend her pleading, it told her that the January 13, 2017 filing deadline was a hard deadline.

White appeals, arguing that the trial court erred by denying her motion to amend her pleading. White, who is still represented by the same attorney, argues that the trial court should have granted her motion (1) because she served interrogatories and (2) because she had less than 30 days to amend her pleading over the holiday. White also contends that KST would not have been prejudiced by any amendment to her pleadings. KST responds that White failed to designate a record on appeal that supports her argument.

"A trial court is given broad discretionary power under K.S.A. [] 60-215 to permit or deny the amendment of pleadings, and its actions will not constitute reversible error unless it affirmatively appears that the amendment . . . denied is so material it affects the substantial rights of the adverse party." *Hajda v. University of Kansas Hosp. Auth.*, 51 Kan. App. 2d 761, 774, 356 P.3d 1 (2015), *rev. denied* 303 Kan. 1077 (2016).

Here, White asserts that by not allowing her to amend her pleading, the trial court made her lose "viable claims." Nevertheless, White never explains what those viable claims under the KCPA were. Appellants must adequately brief issues. Issues that are not adequately briefed are deemed waived and abandoned. *In re Marriage of Williams*, 307

9

Kan. 960, 977, 417 P.3d 1033 (2018). By not explaining what additional claims she would have raised under the KCPA and how those claims were so material as to affect her substantial rights, White has abandoned her argument.

Next, even if White had not abandoned her argument, KST correctly asserts that White failed to include the following in the record on appeal: her motion to amend her pleading, her motion for an extension of time to amend her pleading, the transcript from the hearing where the trial court granted her request to amend her pleading, and the transcript from the hearing where the trial court denied her motion for an extension of time to amend her pleading. Instead, we know about those motions and hearings because KST requested that those motions and hearing transcripts be included in the record on appeal after White had filed her brief.

Appellants have the burden to designate a record that supports their arguments on appeal. Appellants who fails to support their arguments with a record cannot establish error. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Here, this court could not properly analyze White's arguments without her motion to amend her pleading, her motion for an extension of time to amend her pleading, the transcript from the hearing where the trial court granted her request to amend her pleading, or the transcript from the hearing where the trial court denied her motion for an extension of time to amend her pleading. Thus, White's argument also fails for this reason.

Finally, notwithstanding the preceding problems, it is readily apparent that the trial court did not abuse its discretion because the trial court gave White 28 days to amend her pleading. Indeed, *the trial court did not deny White's motion to amend*. Instead, it denied White's motion for an extension of time to amend her pleading after her attorney failed to timely amend her pleading within the 28 days the trial court provided.

10

Moreover, when granting White's motion to amend, the trial court considered that it was the holidays, as well as White's attorney's statements about her health. Then, White's attorney assented to the trial court's 28-day period to amend White's pleading by thanking the court. Under those facts, the trial court's decision to deny White's extension to amend her pleading was entirely reasonable. This is especially true given that White filed her extension to amend pleading after 5 p.m., i.e., after the filing deadline, on January 13, 2017. As a result, we conclude that the trial court properly denied White's motion for an extension of time to amend her pleading.

*Did the Trial Court Err by Denying White's Motion for a Jury Trial?*

White amended her answer and counterclaims for the final time on January 30, 2012. White did not request a jury trial in her amended pleading.

During the case, White submitted two pretrial questionnaires. First, on August, 3, 2016, White submitted a pretrial questionnaire in which she requested a jury trial. Second, on February 23, 2017, White submitted a pretrial questionnaire in which she requested a bench trial. By the time White submitted her second pretrial questionnaire, KST wanted a jury trial.

On March 14, 2017, the court held a motions hearing, where the parties argued the jury trial issue. White stated that "we'd prefer a bench trial." White argued: "[B]ecause [the case] started out as a foreclosure proceeding, foreclosures never go to jury trial and —I think that that's how we got to the point of needing a bench trial." The trial court initially ordered that the parties submit briefs on the jury trial issue by March 24, 2017. White's attorney requested that the trial court extend the deadline to April 15, 2017. The trial court assented.

11

On April 21, 2017, White's attorney filed a notice that it was joining KST's motion for trial before a jury. White's attorney provided no argument of her own why the trial should be to a jury.

On April 25, 2017, the trial court entered an order "denying [the] joint requests for trial by jury." The trial court noted that White raised some legal claims against KST. Even so, the trial court ruled that "[t]he essential nature of [the] case [was] that of a mortgage foreclosure, which [was] equitable in nature." Therefore, the trial court ruled that "White and [KST were] not entitled to trial by jury on the remaining claims in [the] case."

K.S.A. 2017 Supp. 60-238(b) states:

"*Demand*. On any issue triable of right by a jury, a party may demand a jury trial by:
(1) Serving the other parties with a written demand, which may be included in a pleading, no later than 14 days after the last pleading directed to the issue is served; and
(2) filing the demand in accordance with K.S.A. 60-205, and amendments therto."

K.S.A. 2017 Supp. 60-238(d) provides: "A party waives a jury trial unless its demand is properly served and filed, but the court may set aside a waiver of a jury trial in the interest of justice or when the waiver inadvertently results. A proper demand may be withdrawn only if the parties consent."

This court reviews a trial court's application of K.S.A. 2017 Supp. 60-238(b) de novo. See *University of Kansas Hosp. Auth. v. Board of Wabaunsee County Comm'rs*, 299 Kan. 942, 951, 327 P.3d 430 (2014) (holding that an appellate court has unlimited review over a lower court's legal conclusion drawn from statutory interpretation). This court reviews whether the trial court erred by failing to set aside a waiver of jury trial or

to order a jury trial on its own motion for an abuse of discretion. *Scantlin v. Superior Homes, Inc.*, 6 Kan. App. 2d 144, 146, 627 P.2d 825 (1981).

On appeal, White complains that the trial court erred when it denied her request for a jury trial for two reasons: (1) because caselaw, including this court's mandate in *CitiMortgage II*, supports that KCPA claims should be decided by a jury; and (2) because statutory law requires that claims be decided by a jury once a party makes a jury trial request. KST counters that White's arguments are unpersuasive because her jury trial request was untimely. KST asserts that we should affirm the trial court's denial of White's motion for jury trial as being right for the wrong reason. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015) (holding that an appellate court may uphold a trial court that reached the correct result even if it relied on erroneous reasons). KST also counters that White invited any error that resulted from the trial court denying her belated request for a jury trial.

KST's arguments are persuasive. For example, because White filed her final amended pleading on January 30, 2012, under K.S.A. 2017 Supp. 60-238(b)(1), White needed to make a written demand for jury trial "no later than 14 days" afterward. This meant that White needed to file a written demand for a jury trial no later than February 13, 2012. Yet, White did not make a written demand for a jury trial until August 3, 2016—more than four years after the time to make a written demand for jury trial had passed. Thus, White's later written demands for jury trial were untimely. As a result, White did not comply with K.S.A. 2017 Supp. 60-238(b)(1).

This means that she waived her right to jury trial. Therefore, to establish that the trial court erred when denying her request for jury trial, White must prove that the trial court needed to grant her jury trial request in the interests of justice or because the waiver inadvertently resulted. White also must establish that the trial court's failure to grant her

13

request was so unreasonable to constitute an abuse of discretion. Nevertheless, White fails to meet this burden.

To begin with, White never filed a brief arguing why she was entitled to a jury trial within the one-month deadline the trial court ordered at the March 14, 2017 motions hearing. Consequently, her motion joining KST's request for a jury trial was untimely. In consequence, regardless of the trial court's actual reasoning, the trial court did not abuse its discretion when it denied White's jury trial request.

Next, the trial court ultimately adopted White's argument from the March 14, 2017 pretrial conference when denying her motion for jury trial. At that hearing, White argued that the trial court should grant her bench trial request from her February 23, 2017 pretrial questionnaire because her case started as a foreclosure proceeding, that is, an equitable remedy. This is the exact reasoning the trial court relied on in its order for denying the "joint requests for trial by jury."

Whether the doctrine of invited error applies is a question of law. *State v. Hankins*, 304 Kan. 226, 230, 372 P.3d 1124 (2016). It is a well-known rule that when a party has invited error that party cannot complain about that error on appeal. See *Thoroughbred Assocs. v. Kansas City Royalty Co*., 297 Kan. 1193, 1203, 308 P.3d 1238 (2013). Here, it is readily apparent that because the trial court adopted one of White's previous arguments about why it should hold a bench trial, White cannot complain about the trial court holding a bench trial on appeal. Therefore, White's argument fails under the doctrine of invited error.

Last, White does not address that her written demand for jury trial was untimely or that she previously requested a bench trial. In fact, concerning the written demand for a jury trial in her brief, White's attorney quoted the entirety of K.S.A. 2017 Supp. 60-238(a)-(c) except for the time limiting language of subsection (b)(1), which she has

deleted and replaced with ellipses. Arguably, White's attorney has violated her duty of candor to this court by attempting to substantively change K.S.A. 2017 Supp. 60-238. See KRPC 3.3(1) (2018 Kan. S. Ct. R. 344).

Regardless, White has abandoned any argument she may have had about the timeliness of her written demand for jury trial or about invited error by not including those arguments in her brief. *In re Marriage of Williams*, 307 Kan. at 977. For these reasons, we determine that White's arguments fail.

*Did the Trial Court Err by Concluding that Kansas Secured Title Did Not Violate the Kansas Consumer Protection Act?*

Next, White argues that the trial court erred by ruling that KST did not violate the KCPA. White makes several arguments why the trial court erred. White's first argument is that the trial court did not rule on all of her KCPA claims. White's next argument is that the trial court's findings were not supported by substantial competent evidence. In making this argument, White makes arguments why the trial court's findings were insufficient, and why the trial court's rulings were legally incorrect.

KST counters that the trial court ruled on all of White's claims. It contends that substantial competent evidence supported the trial court's rulings because there was no evidence that Davis "knew or should have known the *final* Settlement Statement she received from BNC contained an inaccurate mortgage filing fee."

*Standard of Review*

At trial, after White rested, KST moved to dismiss under K.S.A. 2017 Supp. 60-241, arguing that White failed to establish any violation under the KCPA. The trial court ultimately took the ruling under advisement.

15

When the trial court ruled against White on her UPS courier fees argument, it determined that KST had a right to charge White $20 per courier fee. As a result, the trial court found that substantial competent evidence established that KST had not violated the KCPA as to White's UPS courier fee charges. When the trial court ruled against White on her mortgage registration fee argument, it determined that she had failed to carry her burden of proof. The trial court never mentioned granting KST's motion to dismiss.

Because of the trial court's different rulings, different standards of review are applicable.

When a trial court has determined that substantial competent evidence does not support the plaintiff's claim, "this court must determine if the trial court's factual findings are supported by substantial competent evidence. [Citation omitted.] Substantial competent evidence is evidence which a reasonable person would consider sufficient to support a conclusion." *Schneider v. Liberty Asset Management*, 45 Kan. App. 2d 978, 982, 251 P.3d 666 (2011). This court's review of the trial court's conclusions of law is unlimited. *Lyons v. Holder*, 38 Kan. App. 2d 131, 135, 163 P.3d 343 (2007).

When a trial court rules that the plaintiff has not carried his or her burden of proof, the trial court has made a negative finding:

> "'The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.' [Citation omitted.]" *Cresto v. Cresto*, 302 Kan. 820, 845, 358 P.3d 831 (2015).

To the extent White's arguments involve statutory construction, this court exercises unlimited review. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013).

At this juncture, this court notes that neither party uses the negative finding standard of review on appeal. Instead, both parties consider whether the trial court's findings were supported by substantial competent evidence.

Indeed, KST contends that the trial court's journal entry of judgment should be interpreted as granting its motion to dismiss under K.S.A. 2017 Supp. 60-252 even though (1) it moved for dismissal under K.S.A. 2017 Supp. 60-241 below and (2) the trial court's journal entry never cites either statute or notes KST's motion to dismiss. To accept this argument, we must also accept KST's contention that it meant to cite K.S.A. 2017 Supp. 60-252 below, but failed to do so because it was following the "old K.S.A. 60-241," which was amended in 1997. And, we must liberally construe the trial court's journal entry to find that it granted KST's motion to dismiss even though the trial court (1) never cited either K.S.A. 2017 Supp. 60-252 or K.S.A. 2017 Supp. 60-241 and (2) never stated that it was granting KST's motion to dismiss. Under the belief that the trial court granted its motion to dismiss, KST then asserts this court's standard of review is whether the trial court's findings were supported by substantial competent evidence.

Yet, not only is KST's argument meritless, KST did not cross-appeal. Thus, this court lacks jurisdiction to consider KST's argument that the trial court's journal entry actually granted its motion to dismiss. See K.S.A. 2017 Supp. 60-2103(h); see also *Lyons*, 38 Kan. App. 2d at 135 (holding that the negative finding standard of review applies whenever there is a negative finding regardless of this court's usual standard of review).

17

Notwithstanding the preceding, this court may still consider White's mortgage registration fee arguments even though White has not used the negative finding standard of review. While arguing that the trial court's findings were not supported by substantial competent evidence, White asserts that the trial court ignored undisputed facts or made findings that were not supported by the record—this kind of evidence is needed to overturn a trial court's ruling under the negative finding standard of review.

*Applicable Law*

Before addressing White's individual arguments, this court needs to consider the relevant sections of the KCPA.

K.S.A. 50-623(b) states that the KCPA "shall be construed liberally . . . to protect consumers from suppliers who commit deceptive . . . practices." The issue of whether an act is deceptive is a question of fact. *Dodson v. U-Needa Self Storage*, 32 Kan. App. 2d 1213, 1216, 96 P.3d 667 (2004). "KCPA claims may be established by a preponderance rather than clear and convincing evidence applied to common-law fraud claims." *Kelly v. VinZant*, 287 Kan. 509, 522, 197 P.3d 803 (2008).

Below, White argued that KST was "deceptive" as meant under the KCPA under K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(2), (b)(3), and (b)(7). Those four provisions of K.S.A. 2017 Supp. 50-626 state:

> "(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:
> (1) Representations made knowingly or with reason to know that:
> (A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;

18

. . . .

(2) the willful use, in any oral or written representation, of exaggeration,

falsehood, innuendo or ambiguity as to a material fact;

(3) the willful failure to state a material fact, or the willful concealment,

suppression or omission of a material fact;

. . . .

(7) making false or misleading representations, knowingly or with reason to

know, of fact concerning the reason for, existence of or amounts of price

reductions, or the price in comparison to prices of competitors or one's own price

at a past or future time."

*Presumption of Adequate Findings of Fact and Conclusions of Law*

When the trial court ruled in KST's favor, it included the following findings of fact
and conclusions of law:

"The court finds . . . that overnight delivery charges were justified at the option
of KST to charge the flat fee which it had registered with the Kansas Insurance
Department. It was not deceptive and was not a violation of the KCPA.

"The $4 overcharge for the mortgage registration fee was certainly a mistake.
The question remains as to whether it was deceptive under the Act. The court finds that
the Act will only apply in this case if KST's $4 overcharge, under all the facts and
circumstances surrounding it, constitute 'the willful use, in any oral or written
representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact,'
pursuant to KSA 50-626(b)(2). The other subsections of KSA 50-626(b) do not apply to
the facts of this case."

White argues that the preceding findings of fact and conclusions of law were
inadequate concerning K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(3), and (b)(7). White
emphasizes that the trial court stated that K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(3), and
(b)(7) did not apply without explaining why those subsections did not apply. White cites
K.S.A. 2017 Supp. 60-252(a), which provides that "the court must find the facts specially

19

and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence, or may appear in an opinion or a memorandum of decision filed by the court." KST responds that the trial court's findings of fact and conclusions of law were adequate.

Yet, what neither party recognizes is that White never objected to the trial court's allegedly inadequate findings of fact and conclusions of law below. "Generally, litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies . . . ." *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016). When litigants have failed to object to the trial court's allegedly inadequate findings of fact and conclusions of law, this court presumes the trial court's factual findings and legal conclusions were adequate "so long as the record supports that presumption." *Wing v. City of Edwardsville*, 51 Kan. App. 2d 58, 66, 341 P.3d 607 (2014) (citing *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 [2012]).

Consequently, White cannot complain that the trial court's factual findings and legal conclusions concerning whether KST violated K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(3), and (b)(7) of the KCPA were inadequate because she did not object below. Instead, White may find relief only if the record does not support the trial court's ruling that KST did not violate K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(3), and (b)(7) because those provisions were inapplicable under the facts of her case. Thus, the next question this court must ask is whether the trial court's negative finding was supported by the evidence. See K.S.A. 2017 Supp. 60-252(a)(4) (stating that parties may question whether the trial court's findings are supported by evidence whether the party requested additional findings or objected to the findings below).

20

*UPS Delivery Charges*

The trial court made the following findings and rulings on the UPS courier fees:

> "With regard to delivery fees, KST had filed a form with the Commissioner of Insurance to show their standard charge would be a flat rate of $20 per overnight delivery. It was KST's policy to charge this flat rate for delivery fees, though their actual cost for delivery fees in the White case was $16.92 for two deliveries. A reduced fee was available to them because of their membership in a "Sam's Club"-type association that qualified KST for reduced UPS delivery fees.
> . . . .
> " . . . [T]he court finds [the UPS delivery fee] was a business decision KST was entitled to make. It was represented as a flat fee, and not necessarily the actual cost incurred. Again, this seems a legitimate business practice, in light of the extra trouble it would take to identify, record, and charge the actual cost incurred in every instance."

In short, the trial court determined that because KST charged a flat fee of $20, which White knew about, and which KST "had registered with the Kansas Insurance Department," KST's decision to charge White $20 for the two deliveries was not a violation of K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(2), (b)(3), or (b)(7). The trial court determined this was a legitimate decision even though UPS actually charged KST $16.92 for the two deliveries.

Below, White's complaints about UPS delivery fees were that KST "overcharge[d]" her. White asserted that someone at KST whited out a line in a UPS invoice. While also alleged that KST counsel used the whited out portion of the UPS invoice to allege that the actual delivery fees totaled $41.66 "to make [it] appear as [if she] wasn't overcharged . . . ." In support of this argument, White relied on a letter sent from KST's attorney during the lawsuit, in which he stated that the UPS delivery fees for

21

White totaled $41.66, but KST charged White only $40. White also relied on an allegedly whited out invoice.

Also at trial, White's witnesses testified about the $20 UPS delivery fee being a flat fee that was on file with the Kansas Insurance Commissioner. There was no testimony or other evidence at trial countering the testimony supporting (1) that KST had a policy of charging its customers a $20 flat fee for all UPS deliveries, regardless of the actual cost of the deliveries, or (2) that this policy was not on file with the Kansas Insurance Department.

On appeal, White still contends that the trial court's factual findings about the UPS delivery fees were not supported by the evidence because although UPS actually charged KST $16.92 for her deliveries, KST charged her $20 for her deliveries. White argues that the KST's attorney's letter stating that the total UPS delivery charges were $41.66, as well as the whited out line on the UPS invoice, establishes that the trial court erred.

As a preliminary note, it seems that the part of the invoice that was "whited out" was a heading. This was addressed by the trial court before the initial grant of summary judgment and by the *CitiMortgage I* court. The trial court described the whited out portions as "potentially useful subheadings." 2013 WL 5422317, at *3. Moreover, although the *CitiMortgage I* court reversed the trial court's summary judgment ruling on a separate issue concerning the UPS delivery fees, it noted that the trial "court properly viewed the UPS invoice evidence in a light most favorable to White." 2013 WL 5422317, at *12. Thus, even if the subheading was whited out, the subheading had nothing to do with the calculation of White's UPS delivery fees.

KST's attorney's letter stating that UPS charged KST $41.66 is not supported by any documents in the record. Nonetheless, even if KST's attorney intentionally provided

White with false information during the lawsuit, this alone would not constitute a violation of the KCPA.

To begin with, the acts at issue occurred in October 2008 when White signed her mortgage, not during the pendency of the lawsuit. Next, outside of KST's attorney's letter, nothing supports that KST was violating the KCPA concerning the UPS courier fee. Once more, the only evidence before the court was that KST could charge White a $20 flat fee for each delivery fee. Most importantly, this practice was on file with the Kansas Insurance Commissioner. As a result, White could not establish that KST or its employees *knew or should have known* its practice of charging the $20 flat fee was deceptive as required to be a violation under K.S.A. 2017 Supp. 50-626(b)(1)(a) or (b)(7) of the KCPA. And White certainly could not have established that KST or its employees *willfully* deceived White, intentionally overcharging her each UPS delivery fee, as required to be a violation under K.S.A. 2017 Supp. 50-626(b)(2) or (b)(3). See *Unruh v. Purina Mills*, 289 Kan. 1185, 1194, 221 P.3d 1130 (2009) (holding that willful means an intent to do harm).

In summary, substantial competent evidence supports the trial court's decision that KST did not violate K.S.A. 2017 Supp. 50-626(b)(1)(a), (b)(2), (b)(3) or (b)(7) of the KCPA because the evidence supports the charging of a $20 flat fee per delivery was a legitimate "business decision KST was entitled to make."

*Price Reductions—K.S.A. 2017 Supp. 50-626(b)(7)*

To review, K.S.A. 2017 Supp. 50-626(b)(7) states:  "Deceptive acts and practices include . . . making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of *price reductions, or the price in comparison to prices of competitors or one's own price at a past or future time*." (Emphasis added.)

23

The issue of KST overcharging White $4 for the mortgage registration fee does not involve a misleading representation about (1) a price reduction, (2) a price in comparison to prices of competitors, or (3) a price in comparison to KST's prices at a past or future time. At trial, the undisputed evidence showed that KST charged White for a 15-page mortgage when she actually had a 14-page mortgage, resulting in the overcharge. Thus, nothing indicates that the trial court arbitrarily disregarded undisputed evidence when finding White failed to sustain her burden that KST violated K.S.A. 2017 Supp. 50-626(b)(7) as to her mortgage registration fee arguments.

*Willful—K.S.A. 2017 Supp. 50-626(b)(2) and (b)(3)*

In its order denying White's claims against KST under the KCPA, the trial court quoted our Supreme Court in *Unruh* at length in an effort to define "willful":

"The Court of Appeals majority concluded that the word 'willful' means something more than 'intentional'; it must also include an 'intent to harm the consumer.' *Unruh,* slip op. at 11. It reached this conclusion based on two factors.

"First, in 1991, the legislature substituted the word 'willful' for the word 'intentional' in both K.S.A. 50-626(b)(2) and in K.S.A. 50-626(b)(3). L.1991, ch. 159, sec. 2. In 1993, it amended K.S.A. 50-626(b)(3) a second time to substitute 'willful' for another use of 'intentional' in that subsection. L.1993, ch. 177, sec. 1. Because the appellate courts presume that the legislature does not intend to enact useless or meaningless legislation, see *Hawley v. Kansas Dept. of Agriculture,* 281 Kan. 603, 631, 132 P.3d 870 (2006), the Court of Appeals concluded that the legislature intended the word 'willful' to mean something more restrictive than the word 'intentional.' *Unruh,* slip op. at 11.

"Second, the Court of Appeals looked to PIK Civ. 3d 103.04, which defines 'willful conduct' as '[a]n act performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another.' Slip op. at 11; see PIK Civ. 4th 103.04 (same definition). The Court of Appeals cited to three cases that applied the PIK definition to civil litigation in general: *Heckard v. Martin,* 25 Kan. App. 2d 162, 165, 958 P.2d 665 (1998) (under Residential Landlord and Tenant Act, PIK Civ. 3d 103.04

24

definition of 'willful' required tenant have intent to do wrong or cause injury to another); *Tufts v. Newmar Corp.,* 53 F. Supp. 2d 1171, 1178 (D. Kan. 1999) (citing *Heckard* and quoting PIK Civ. 3d 103.04 for proposition that 'willful conduct' under the KCPA requires showing intent to do wrong or cause injury to another); and *Griffin v. Security Pacific Automotive Financial,* 33 F. Supp. 2d 926, 930 (D. Kan. 1998) (citing *Heckard* and quoting PIK Civ. 3d 103.04). *Unruh,* slip op. at 12.

"This definition of the word 'willful' in the PIK instructions was based upon language in a case heard by this court in 1908. See *Railway Co. v. Lacy,* 78 Kan. 622, 629, 97 P. 1025 (1908), *reh. denied* November 12, 1908 ('To constitute willful negligence, there must be a design, purpose, or intent to do wrong or to cause the injury.'). It has remained virtually unchanged since the first publication of the pattern instructions. The legislature is presumed to be aware of the existing law when it enacts an amendment. See *State v. Boyer,* 289 Kan. 108, 116, 209 P.3d 705 (2009); *Frick v. City of Salina,* 289 Kan. 1, 8, 208 P.3d 739 (2009). *We therefore agree with the reasoning of the majority for the Court of Appeals, find that it was correct, and affirm the holding that the use of 'willful' in the KCPA includes an intent to harm the consumer*." (Emphasis added.) *Unruh*, 289 Kan. at 1194-95.

After providing this analysis, the trial court equated the term "willful" with the term "harm," ultimately finding there was no evidence that KST intended to harm White. The trial court found that Davis "relied on the accuracy of the third Settlement Statement, which was understood to be accurate and final."

White's arguments why the trial court erred when finding that she failed to meet her burden of proof under subsections (b)(2) and (b)(3) have two parts. First, White asserts that the trial court erred because the trial court misinterpreted the term "willful" as meant under (b)(2) and (b)(3). She argues that the trial court "required [her] to establish that KST intended to harm [her] as part of whether [the act] was willful." She contends that this interpretation of willful was errant because the term "harm" is not in the plain language of K.S.A. 2017 Supp. 50-626. White also points out that the term "harm" is not

25

in the willful misrepresentation of a material fact jury instruction—Pattern Jury Instruction (PIK) Civ. 4th 129.03.

Nevertheless, PIK Civ. 4th 129.03 simply incorporates the language of K.S.A. 2017 Supp. 50-626(b)(2). Thus, there would be no reason for PIK Civ. 4th 129.03 to include the term harm since K.S.A. 2017 Supp. 50-626(b)(2) does not include the word harm. More importantly, White's argument completely ignores that the trial court relied on our Supreme Court in *Unruh* when determining that the term willful under the KCPA means harm. The *Unruh* court's decision involved an in-depth interpretation of K.S.A. 2017 Supp. 50-626(b)(2) and (b)(3), which included legislative history and interpretation of PIKs that actually define willful or willful conduct. 289 Kan. at 1194-95. White's argument about the term "harm" not being within the plain language of  K.S.A. 2017 Supp. 50-626 does not negate our Supreme Court's analysis supporting that the terms willful and harm are synonymous.

Moreover, this court is duty bound to follow our Supreme Court precedent absent some indication that our Supreme Court is moving away from its previous position. *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015), *rev. denied* 303 Kan. 1078 (2016). Here, no indication exists that our Supreme Court is moving away from its positon that "[p]roof of willful conduct under the [KCPA] requires proof of intent to harm the consumer." *Unruh*, 289 Kan. 1185, Syl. ¶ 6. As a result, we reject White's first argument.

White's second argument is that evidence does not support the trial court's ruling that KST did not violate K.S.A. 2017 Supp. 50-626(b)(2) and (b)(3). White believes evidence did not support the trial court's rulings as to subsections (b)(2) and (b)(3) because she presented evidence of two other recording fee overcharges by KST on the same afternoon KST recorded her mortgage. White asserts that although a singular act may suggest a mistake, a pattern, like the three overcharges in one afternoon, suggests a

"practice of discrimination." KST contends that there was no evidence that KST "intentionally intended to harm [] White by asking her to sign a Closing Statement that had a $4.00 mistake in it."

Although the undisputed evidence establishes that KST overcharged two other clients the same afternoon as White, Baum's and Davis' testimony also support that there were three parties relying on one another during closing to provide accurate information—Baum, Davis, and BNC. Baum explained that when she made the adjustments to insert in the second settlement statement, she would guess on the number of mortgage pages. Baum testified that the lender would tell KST to change the closing statement if any of the fees were incorrect. But she also testified that she was relying on BNC to change the closing statement after KST had sent the wrong information on the second settlement statement.

Meanwhile, Davis admitted it was likely the closing agent's responsibility to provide accurate information about fees. Even so, Davis testified that she believed the mortgage recording fee was "accurate" when she went over it with White because "BNC approved [her] final numbers." She also testified that she never intended to mislead or deceive White.

Last, at trial, White emphasized that the money she and the other parties overpaid on October 8, 2008, immediately went out of the cash kitty to cover the $9 underpayment for the assignment of title by another KST customer that same day.

Simply put, the evidence at trial supported that the people involved in White's closing process believed somebody else had verified the accuracy of the mortgage recording fee. No evidence supported malevolency. Instead, it was a case of KST employees passing the buck. Further, because both overcharges and undercharges existed, it is possible that the overcharges and undercharges cancelled one another out.

27

Given the preceding facts, this court affirms the trial court's negative finding as to White's claims that KST violated K.S.A. 2017 Supp. 50-626(b)(2) and (b)(3). In turn, this court need not consider White's argument that the trial court misinterpreted the term "material" as the term "material" appears only under K.S.A. 2017 Supp. 50-626(b)(2) and (b)(3).

*With Reason to Know—K.S.A. 2017 Supp. 50-626(b)(1)(A)*

Once more, K.S.A. 2017 Supp. 50-626(b)(1)(A) states: "Deceptive acts and practices include . . . Representations made knowingly or with reason to know that: (A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have."

Therefore, under the plain language of K.S.A. 2017 Supp. 50-626(b)(1)(A), to establish a KCPA violation, a consumer must establish two elements: (1) that the business provided "[p]roperty or services [that had] sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that [it did not] have"; and (2) that the business knew or should have known it was doing the preceding.

As noted by the *CitiMortgage II* court when reversing the trial court's summary judgment ruling, our Supreme Court has held that "an overcharge could be analyzed under K.S.A. 50-626(b)(1)(A)." 2016 WL 199059, at *3. In *Via Christi Regional Med. Center, Inc. v. Reed*, 298 Kan. 503, 521, 314 P.3d 852 (2013), our Supreme Court quoted the language of K.S.A. 50-626(b)(1)(A), and then held: "Certainly, an overcharge or duplicate charge—in essence, a demand for payment for a service the consumer did not receive—misrepresents the use, benefit, or quantity of that service." Thus, according to our Supreme Court precedent, KST's $4 overcharge fits within the plain language of the

28

action element. Consequently, to establish a KST violation, White need only prove that KST knew or should have known it overcharged her $4 for her mortgage registration fee.

Although the trial court simply ruled that K.S.A. 2017 Supp. 50-626(b)(1)(A) did not apply under the facts of White's case, the trial court still made fact-findings that addressed whether KST acted knowingly or with reason to know:

- "Both KST and the lender were aware of how much a Kansas Register of Deeds charges to register a mortgage, which [was] eight dollars for the first page and four dollars for each additional page."
- "While the closing agent for KST would be able to make adjustments to this final settlement statement if necessary, such an adjustment was considered to be unusual."
- "Davis could have counted the pages of the mortgage and thus could have realized that the charge should have been $60."
- "[Davis] relied on the accuracy of the third Settlement Statement, which was understood to be accurate and final. This statement was usually reliable."

In its brief, KST contends that White did not prove a violation under K.S.A. 2017 Supp. 50-626(b)(1)(A) because the only evidence at trial was the following: (1) Davis did not suspect BNC would provide her with an inaccurate mortgage registration fee charge; and (2) BNC had always provided accurate information in the past. Nevertheless, neither KST's contentions nor the trial court's fact-findings are supported by the record on appeal.

Starting with the trial court's finding about late changes to the final settlement agreement being unusual, we note that even if making a change to the final settlement agreement was unusual, the unusualness of making changes does not affect the following: (1) that there was a process for making a change that KST did not use; and (2) that White

29

was overcharged for the service of recording her title. KST could remedy this by either amending the settlement statement before closing or issuing a refund after closing. KST did neither. Accordingly, when ruling against her, the trial court ignored the undisputed evidence that there was a process to remedy the mortgage registration fee overcharge on the final settlement statement.

Turning to the trial court's finding that BNC knew Kansas' mortgage registration fee, we note the trial court ignored other evidence supporting that BNC was not accurately calculating mortgage registration fees. Although Baum testified that "the lender would have knowledge of our recording fees for our state," Davis explicitly testified that "most of the lender instructions have the wrong recording and settlement charges." Moreover, BNC never approved the correct mortgage registration fee in White's case.

In BNC's first settlement agreement, BNC included $120 for the mortgage registration fee. Under Kansas' filing rate, a 28-page mortgage would cost $120. This number was twice what White should have been charged for her 14-page mortgage. Additionally, BNC did not correct KST's calculation upon receiving the second settlement statement, charging White $64, instead of $60, for the mortgage registration fee. Under the assumption BNC knew Kansas' mortgage registration fee equation, because BNC wrote the mortgage, BNC could have counted the pages in the mortgage and calculated the correct mortgage registration fee.

Thus, BNC's decision (1) to charge White for $120 for the fee in the first settlement statement, and (2) to approve the $4 mortgage registration fee overcharge in the final settlement statement, undermines the trial court's fact-finding that BNC knew how much Kansas' mortgage recording fee would be. In its journal entry, the trial court entirely ignored (1) that Davis testified that lender instructions were usually inaccurate, and (2) that BNC never had the correct mortgage recording fee on its settlement

30

statements. Simply put, the undisputed evidence at White's trial established that even if BNC knew how to calculate Kansas' mortgage registration fee, BNC was not doing so in White's case.

The preceding undisputed evidence also refutes the trial court's final finding that the final settlement statement was usually reliable. Again, the reliability of the final settlement statement is KST's only argument why this court should uphold the trial court's ruling that it did not violate K.S.A. 2017 Supp. 50-626(b)(1)(A) on appeal.

The trial court's finding that BNC's final settlement statement was usually accurate is key since Davis would likely not suspect the mortgage recording fee was inaccurate if BNC usually provided reliable information on mortgage recording fees. Nevertheless, a review of the trial court's factual finding, as well as undisputed evidence the trial court ignored, draws into question the trial court's conclusion that the final settlement statement was usually reliable.

To begin with, White presented the evidence establishing that the afternoon KST filed her mortgage, KST filed three other deeds with Shawnee County. Of those three deeds, KST overcharged two other registration fees. In turn, we can deduce that the same afternoon White closed her transaction, three of the four clients for which KST conducted a closing had settlement statements with the incorrect recording fees. Although KST did not dispute the other overcharges, the trial court never addressed the other overcharges in its order. Thus, the trial court arbitrarily disregarded or ignored this undisputed evidence.

Moreover, as considered in the previous section on KST not acting willfully, the undisputed evidence establishes that the KST employees expected somebody else to verify the accuracy of the mortgage recording fee. Again, Baum explained how on BNC's settlement statement, BNC listed the mortgage registration fee at $120. She then reduced it to $64 assuming that the mortgage would be 15 pages long, given that mortgages are

31

usually 14 to 16 pages long. Davis then entered this number on the second settlement statement and sent the statement to BNC. Once BNC approved the paperwork and sent the final settlement statement, Davis did not count the mortgage to ensure all the fees were accurate given that BNC approved her final numbers. Davis testified that she believed the mortgage registration fee was accurate because BNC approved the $64 fee, even though she also testified to the following: (1) that it was the closing agent's duty to provide accurate information about closing fees; and (2) that "most of the lender instructions have the wrong recording and settlement charges."

As a result, the following undisputed evidence undermines the trial court's finding that BNC's final settlement statement was usually accurate: (1) that KST overcharged two other clients for registration fees the same afternoon White closed; (2) that BNC never accurately calculated White's mortgage registration fee; (3) that Baum guessed how many pages were in the mortgage when calculating the mortgage recording fee; (4) that Davis believed it was the closing agent's responsibility to ensure fees were accurate; and (5) that Davis knew most lender instructions have the wrong recording fees.

Last, the trial court ignored undisputed evidence establishing that KST knew or should have known the settlement statement was not accurate concerning the mortgage recording fee as to White's case. It is undisputed that KST, through Baum, did not rely on BNC's proposed mortgage recording fee in the first settlement agreement. Instead, Baum guessed that the mortgage would be 15 pages long, resulting in White's $64 mortgage registration fee. When BNC approved the $64 mortgage registration fee, KST should have known that White could have been overcharged (1) because BNC's initial $120 mortgage registration fee was inaccurate, indicating BNC was not accurately calculating the fee, and (2) because Baum guessed how many pages were in the mortgage. Additionally, to determine whether the mortgage recording fee was accurate, Baum or Davis only needed to count the pages of the mortgage. Simply put, under these facts, KST should have known that it was overcharging White on her mortgage registration fee.

32

In summary, the trial court arbitrarily ignored undisputed evidence. The trial court determined that White failed to meet her burden of proof that KST violated the KCPA by knowingly, or with reason to know, making representations that were not true (1) because changes to the final settlement statement were unusual, (2) because lenders knew Kansas' equation for calculating mortgage recording fees, and (3) because the lenders' final settlement statements were usually accurate. Nevertheless, the trial court ignored undisputed evidence that KST had overcharged two other clients that afternoon, meaning their settlement statements were also inaccurate. The trial court ignored that BNC never approved an accurate mortgage registration fee in White's case. Moreover, the trial court ignored that KST employees told BNC that the correct mortgage recording fee was $64, even though they did not have the mortgage to calculate this fee. The KST employees never ensured the fee was accurate upon receiving the mortgage and final settlement statement from BNC, even though doing so would have ensured White was charged correctly.

For these reasons, we reverse the trial court's negative finding that White failed to meet her burden to prove KST violated K.S.A. 2017 Supp. 50-626(b)(1)(A) of the KCPA. In turn, we reverse and remand to the trial court to hold a hearing on penalties under the KCPA.

Reversed and remanded with directions.